NEWTON E. KNIGHT

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 24, 1901.*

APPEALS AND ERRORS—*when admission of incompetent evidence can not be assigned as error.*  Permitting a witness to testify in a murder trial as to an admission made to him by the accused cannot be availed of as error, even though the communication may have been privileged or otherwise incompetent as evidence, where the accused testified to the same fact on his own behalf.

WRIT OF ERROR to the Circuit Court of Edgar county; the Hon. FRANK K. DUNN, Judge, presiding.

The plaintiff in error, Newton E. Knight, was convicted of the murder of his brother, Silas H. Knight, commonly known as "Hutch" Knight, at the November term, 1900, of the circuit court of Edgar county, and sentenced to imprisonment in the penitentiary for the term of fourteen years.

The two brothers were unmarried and lived with their mother on her farm of eighty acres, in Edgar county. The mother had been insane for many years, and her son David Knight, another brother of plaintiff in error, living in another part of the county, had been appointed and was acting as her conservator. Another brother, Marion Knight, had formerly resided on the place and taken care of his mother there, but he having died six or seven years before the tragedy, Hutch Knight remained on the place, caring for his mother, for the next two years, but refused to pay any rent to or enter into any contract with her conservator respecting the farm or the payment of rent. At the end of that time the conservator rented the east forty acres of the land to a stranger, and rented the west forty acres, which included the dwelling house and other buildings on the premises, to the plaintiff in error for the rental of $150 per annum.  He, Newton E. Knight, was to live on the place and apply the rental to the sup-

port of his mother. Hutch Knight was present when this contract was made, and agreed with the conservator and the plaintiff in error to leave the premises in April following, but afterward refused to do so and continued to occupy a part of the dwelling house and of the barn and lots, surrendering, however, all of the land except six acres, which he retained and used for nearly two years and up to the time of his death. The evidence shows that disagreements arose between Newton and Hutch Knight because of the latter's refusal to leave the premises; that there were angry quarrels between them, and that Hutch Knight had threatened to kill plaintiff in error if the latter forced him to leave the place. The two brothers were on good terms up to the time Hutch Knight refused to vacate and leave the place as he had agreed to do, and had occupied the same room, sleeping in the same bed, but after that time they ceased to speak to each other and occupied different rooms and each kept aloof from the other. The evidence tends to prove that Hutch Knight had threatened to strike plaintiff in error with an ax, and that he kept an ax under his bed at night, and that plaintiff in error put an extra partition across his own room and kept his door bolted at night. On the evening of the 19th of February, 1900, Hutch Knight, at about six o'clock, after having eaten his supper, went out of the house, and within a half hour or less time Newton also went out, but there was no evidence of any quarrel between them at that time. Newton went to the post-office at the village of Warrenton, a mile away, and got his mail, and the evidence was that he was at the house of one Wieland, in that village, from twenty to thirty minutes after six o'clock, while Wieland was eating his supper, to collect some money from Wieland, and that he and Wieland met soon after Wieland had finished his supper, at the post-office, where they had a settlement, and Wieland paid Newton for hauling corn. Plaintiff in error returned home about eight o'clock that evening.

As a witness in his own behalf he testified that on his return home he went out to see about his stock near the barn, to see if they and the fences were all right; that Hutch had often thrown down the fence and let the stock out; that he saw him (Hutch) apparently putting up the fence or doing something with the fence; that Hutch, seeing him, grabbed an ax which he had near him and started toward plaintiff in error with the ax, and said: "God damn you, you tore my fence down, and if you tear it down any more—;" that he, the plaintiff in error, had a revolver in his pocket, and when he saw Hutch advancing on him with the ax he started running backwards and fired his pistol twice at Hutch as he ran, but did not see any more of him and did not know whether he had hit him or not; that he was fifteen or twenty feet from Hutch when he fired; that he then went into the house and went to bed and stayed there till next morning, when he got up and went out, between six and seven o'clock, to feed his stock, when he saw his brother Hutch lying dead by the fence. After he had eaten his breakfast he went to a railway station a few miles away and took the train for Paris, the county seat of Edgar county, where he saw and consulted with his counsel and then surrendered himself to the sheriff. Besides the two brothers, Newton and Hutch, and their mother, the only persons in the family at the time of the tragedy were their sister, Julia Cutts, and a little girl six or seven years of age. Mrs. Cutts was at the time, and had been for about two weeks, confined to her bed by sickness. From her testimony it appeared that she knew nothing of the death of her brother Hutch until the next morning, when his body was found by a neighbor, lying where he had been killed. The evidence showed that the cause of the death of Hutch Knight was a gun or pistol shot wound in his forehead; that the bullet had entered the center of the temporal bone in front and lodged in the base of the brain, causing almost immediate death; that the course of the bullet

was downward, toward the base of the brain. An ax was lying in the snow near the body. The body was lying near the fence, which the evidence tended to show he had been putting up. The evidence tended to prove that when the body was examined by a physician at the inquest, before noon of the day after the tragedy, it was in a state of *rigor mortis*, and that death had ensued at least eight hours before. A witness who lived on a farm adjoining the Knights testified that about six o'clock, or shortly after, when it was getting dusk, in the evening of the day Hutch Knight was killed, he heard a shot fired which sounded like a target gun, in the direction of the Knight home. The theory of the State was that plaintiff in error killed his brother before he went to Warrenton for his mail, and not after his return, and not in the manner testified to by him. It was also shown by the evidence that plaintiff in error had always borne a good character for peaceableness.

H. S. TANNER, and DUNDAS & O'HAIR, for plaintiff in error.

J. W. MURPHY, State's Attorney, J. W. HOWELL, and VANSELLAR & SHEPHERD, for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

In addition to other evidence, the substance of which is contained in the foregoing statement of the case, it appeared that plaintiff in error, on the morning after the killing of his brother and while on the train on his way to Paris, had a conversation with Alfred Tanner, a duly licensed attorney at law of this State. Tanner testified that plaintiff in error asked him if he was a lawyer, and that he (Tanner) told him that he was, and that he then asked him (Tanner) if he was the one who had been State's attorney of Edgar county, and on receiving an affirmative reply said to him that he wanted to ask his advice, and stated that he had had trouble with his brother and had

killed him. Tanner further testified that plaintiff in error said he was on his way to Paris to see Henry Tanner, witness' brother, who was a practicing attorney, and that he thought at first that witness was Henry Tanner until witness told him otherwise; that witness advised him not to talk to any one but to go and see his attorney; that witness understood that plaintiff in error was asking him for legal advice, but that he did not employ him or pay or promise to pay him anything, and that he did nothing more than to give him the advice stated and go with plaintiff in error to the office of Henry Tanner, with whom he also had his office and for whom he sometimes transacted legal business, and not finding Henry Tanner in the office he directed plaintiff in error to Henry Tanner's house. Counsel having examined the witness on the *voir dire* and elicited the facts and circumstances above stated, objected to the testimony of the witness as to any communication to him by plaintiff in error in reference to the killing, on the ground that it was privileged. The objection was overruled and the witness testified, as stated, to the admission by plaintiff in error that he had had trouble with his brother and had killed him. Exception was taken to the ruling of the court, and this ruling is, as counsel say, the chief error relied on for a reversal of the judgment.

We think it wholly unnecessary to consider whether the relation of attorney and client existed or not between plaintiff in error and Alfred Tanner when the admission was made, or whether, for any reason, it was error to permit said Tanner to testify to such admission or communication, for the reason that plaintiff in error, after the testimony was given and when a witness in his own behalf, made the same admission of the killing and testified before the jury to the same matter. Even if erroneous and harmful when given, Tanner's testimony was rendered wholly harmless by the testimony of defendant, in which he made the same admissions to the jury that

he had made to Tanner. After defendant's testimony was given it was no longer a question in dispute whether he had killed Hutch Knight or not, but only under what circumstances and with what intent he killed him, and Alfred Tanner's testimony did not bear upon the latter question at all.

But counsel say that by the admission of Tanner's testimony the defendant was forced to become a witness and to state the facts of the killing. We think this argument is without force, for it certainly remained optional with the defendant to testify or not. If he considered that the killing by him was not sufficiently proved by evidence other than Tanner's testimony to call for any explanation on his part, he could have remained off the witness stand, and, if convicted, assigned the admission of Tanner's testimony as error, and availed himself of any advantage which the decision of that question would have given him. But it seems too clear for argument that he could not go on the stand as a witness in his own behalf and testify to the same fact that he had communicated to Tanner, and then, after conviction, assign as error the admission of Tanner's testimony of such fact.

A general complaint is made of the rulings of the court in giving and refusing instructions, but no specific error is pointed out, and after a careful examination of them we have been unable to discover any error in this regard.

It is also claimed that the verdict and judgment were against the weight of the evidence, and that the court below erred in not sustaining the motion for a new trial on this ground. We have given the record a careful examination, and are of the opinion that the evidence was sufficient to justify the jury in their finding. They and the court below saw and heard the witnesses testify and were better able to test their credibility than we. We cannot disturb the verdict on the evidence before us.

The judgment must be affirmed.

*Judgment affirmed.*