Argued May 3, decided May 31; rehearing denied August 1, 1911.

## YOUNG'S ESTATE.

[116 Pac. 95: 116 Pac. 1060.]

WITNESSES — TERMINATION OF RELATION — COMMUNICATIONS WITH CLIENT.

1. Where the relation of attorney and client had terminated when the attorney received a letter from his former client with reference to decedent's estate, the attorney was not disqualified to testify to a postscript attached to the letter asserting that the rainbow the subscriber chased was quite brilliant, and that she would have a will for probate that would surprise the attorney, on an issue as to the genuineness of an alleged will subsequently offered by her for probate which was claimed to be a forgery.

WITNESSES—ATTORNEY AND CLIENT—WAIVER OF PRIVILEGE.

2. Where an alleged will offered for probate by proponent was attacked as a forgery, and she voluntarily offered herself as a witness on the general subject of the execution of the will, she thereby waived the right to object to the examination of her former attorney as a witness on the same subject as provided by Section 734, L. O. L.

WILLS—CONTEST—GENUINENESS.

3. Evidence construed, and held to require a finding that a will offered for probate by proponent was a forgery.

WILLS—APPEAL—PARTIES—DEATH PRIOR TO APPEAL—NECESSITY OF SUBSTITUTION—"ADVERSE PARTY."

4. Section 549, L. O. L., declares that any party to a judgment or decree may appeal therefrom, and section 550 provides for notice of appeal, which shall be sufficient if it contains the title of the cause, the names of the parties, and notifies the adverse party or his attorney that an appeal is taken to the Supreme or circuit court as the case may be, from the judgment, order or decree, or some specified part thereof.  Held, that the words "adverse party" as so used mean an adverse party on the record, and hence where all the contestants of a will appeared by the same attorneys for the same purpose and their interests were identical and not adverse, and a decree was given against all the defendants, sustaining the will, the fact that one of the contestants died prior to appeal, and that no substitution was had or notice of appeal served on the representatives of her estate, did not require a dismissal thereof.

JUDGMENT — NATURE AND ESSENTIALS — DEATH OF PARTY BEFORE JUDGMENT.

5. A judgment given against a person who dies before the hearing and submission of the cause is void, and not merely voidable.

ABATEMENT AND REVIVAL—DEATH OF PARTY—STATUTORY PROVISIONS.

6. Under Section 38, L. O. L., providing that an action shall not abate by the death of a party, if the cause of action survive, and that the court may within one year allow the action to be continued against the party's personal representatives or successors in interest, thereby relaxing the common-law rule that a suit is abated by the death of the party, the suit is suspended until the substitution is made, and the suspension has the same temporary effect on the rights of the parties as though the suit were actually abated.

JUDGMENT—FORM AND REQUISITES—DESIGNATION OF AMOUNT—COSTS.

7. A decree adjudging that a party recover for "costs and disbursements herein sustained and expended on this appeal; and the costs and disbursements for transcript on this appeal; and the costs and disbursements paid the stenographer for extending stenographic notes of the testimony of witnesses taken in the trial in the court below, amounting to $————; and that she recover from respondent all her costs and disbursements in the county court sustained and expended in this cause to be taxed, and that execution issue therefor"—is a nullity, as to costs, until they are properly taxed and entered in the judgment.

From Umatilla: HENRY J. BEAN, Judge.

Statement by MR. JUSTICE MCBRIDE.

James W. Young, a resident of Weston, Umatilla County, Oregon, died on the 26th day of August, 1905, leaving real and personal property, approximately of the value of from $30,000 to $40,000. He left a will, bequeathing a farm in Umatilla County to Mrs. Nora Watts, a niece, making no disposition of his other property, which, in the absence of testamentary disposition, devolved upon certain nephews and nieces who were parties to this proceeding in the court below. The will was admitted to probate on September 19, 1905, and B. B. Hall was appointed administrator of the estate. The proponent of the will now in controversy is a niece of deceased and also his stepdaughter, being the daughter of his brother. Her mother was divorced from her first husband and subsequently married deceased, and in about the year 1891 she separated from him and secured a divorce. Mabel Warner, then Mabel Young, remained in the care of deceased who paid for her care and education until 1893, when she went to stay with her mother, and later married one Cain, by whom she had four children and from whom she was subsequently divorced, thereafter marry-

ing Warner, her present husband. Under circumstances
which will be mentioned in the opinion, she professed to
have found in the custody of Hall, the administrator of
Young's estate, a will, purporting to give to Nora Watts,
a niece of deceased, the sum of $300; to Fred Young,
nephew of deceased, and brother of proponent, $500; to
Grace Rogers, a niece, $300; and to proponent the residue
of the estate, with a request to pay to one Mrs. Picard
the sum of $15 per month for life. This will purported
to have been witnessed by Hon. John McCourt, now
United States district attorney, and W. A. Larkins, and
was dated October 8, 1893. It was placed in the hands
of a firm of attorneys for probate, but upon inquiry the
alleged witnesses disclaimed any connection with it, and
it was not probated. It is practically conceded to be a
forgery.

Later, another one of her attorneys received through
the mail an instrument purporting to be the will of
deceased, bequeathing to Fred Young, a nephew, $1,000;
to Lile Young and Norman Young, nephews, $300 each;
to Mrs. Picard, a friend, $500, and to proponent $10,000;
and all the real and personal property of deceased. This
will was also repudiated by the alleged witnesses, and it
is practically conceded to be a forgery. Proponent was
indicted for forgery, but was not convicted. She there-
after commenced a suit in equity to recover the estate of
deceased upon an alleged contract made by him to her
mother, at the time of her divorce from him, wherein
it was claimed that he agreed that, in consideration of
the mother making no claim for alimony, he would
bequeath all his property to proponent. She was defeated
in this suit. On February 4, 1909, proponent presented
to the county court for probate an instrument purporting
to be the will of deceased which reads as follows:

"Weston, Nov. 21, 1893.
"I, J. W. Young, before God, make this my last will
and testament. To my daughter, May Young, I give and

bequeath all my property, in fulfillment of a solemn and binding contract made with her mother. I appoint I. E. Saling, my executor.                    J. W. Young [Seal].

"I acknowledge this my will and sign my name and set my seal in presence of the following witnesses.

"J. W. Young [Seal].

"S. V. Knox, Weston, Oregon.

"Louis Ragle X̲ Weston, Oregon."
                 mark

His

Proponent claimed that this will was sent to her by mail in a sealed envelope, together with an old memorandum book which she identified as one long used by deceased, and that the sender was unknown to her. This book with its entries was introduced for the purpose of comparison to identify the handwriting of the entries therein with the will in question. For the same purpose proponent also introduced two letters purporting to have been written by deceased; one to proponent, dated September 30, 1904, and known in this record as defendant's Exhibit 51, and another purporting to be from deceased to Clara Young, the wife of proponent's brother, dated August 2, 1905, and designated as plaintiff's Exhibit E. Other facts appear in the opinion. The county court found against the validity of the proposed will, and proponent appealed to the circuit court, which reversed the decision and admitted the instrument in probate. From this decree contestants have appealed to this court.

REVERSED.

For appellants there was a brief with oral arguments by *Messrs. Fee & Slater* and *Mr. Frederick W. Steiwer*.

For respondent there was a brief and an oral argument by *Mr. Douglas W. Bailey*.

MR. JUSTICE MCBRIDE delivered the opinion of the court.

We are forced to the conclusion that the alleged will is a forgery. And not only that it is a forgery, but that the letters and exhibits produced by proponent to sustain

it are also forgeries. It is practically conceded, and no reasonable person can doubt, that both the alleged wills previously produced, which purported to convey the bulk of the property of deceased to proponent, were bold, impudent forgeries. It is a fair presumption that they were made in the interest and at the instigation of the person who was to profit by them. They were discovered in the possession of proponent, and there is nothing in the evidence indicating that she had any friend so interested in her welfare as to forge wills in her favor. It is true that one of them came not directly to her but to her attorney, who, as an honorable gentleman, declined to act upon it. But it would be an easy matter for proponent herself or some one in her behalf to mail it to her attorney. The wills were for her benefit. Who but she could have an interest in fabricating them. But there is direct and reliable testimony connecting her with the fabrication of the first alleged will in her favor. B. B. Hall, who was appointed administrator of Young's estate, testifies that he made exhaustive search for papers belonging to Young and found no will, except the one first admitted to probate. He kept the papers of deceased at the bank in a private box that he had used during his lifetime and was thoroughly familiar with them, and is positive that the pretended will was not among them.

1. In April, 1906, proponent called upon him at the bank and asked for permission to look over Young's papers. This was granted and proponent in company with her brother, Fred Young, went with witness into the private room of the bank and the box was placed upon the table, proponent sitting on one side and witness on the other, with the box between them. While proponent was examining the contents of the box, Fred Young made some inquiry as to the location of a lot in Weston, and proponent attracted the attention of witness for a moment to a plat of the town, which hung on the wall behind him. When he turned his attention to the

box again he found the envelope containing the first alleged will in favor of proponent in the box. He took it up and proponent said: "Oh, this is what I have been looking for. It is the last will of Uncle Jim. How long has it been here?" To which question witness answered, "Not to exceed a minute or two minutes, madam; just since you dropped it in there." Hall swears that he knows that the alleged will had not been there previously, and he is a reliable and disinterested witness. The theory of proponent that Hall was hiding or suppressing the document is absurd. If he knew the box contained a will he had only to refuse to permit her to examine it or to have first removed it from the box and then allowed an examination. The conclusion is irresistible that she placed the alleged will in the box while his attention was diverted to the map. Her connection with the will sent to Carter is not so clearly shown, though the letters in the signature of J. W. Young, in all three of the alleged wills, are spaced so nearly alike that they might be superimposed one upon the other and practically coincide. It is a practical impossibility for a man to write his name three times exactly alike, and this similarity is strong evidence that all three signatures were traced from a single genuine signature. Here we have evidence connecting proponent with the fabrication of two false wills and when she produces a third, its genuineness is at least open to suspicion. The interest of proponent to forge a will and her disposition to do so are established not only by the facts above stated but by other evidence as well. Thus on November 29, 1905, she wrote as a postscript to a letter to Phelps & McCourt, who at one time had been employed by her to ascertain whether she had been legally adopted by deceased, and who had told her she was "chasing a rainbow," the following: "Phelps, I think that rainbow I chased was quite brilliant. I will have a will for probate that will surprise you." This testimony was excluded on the trial as a privileged communication. But we think it was admissible, as the relation of attorney and client

Sig. 12

had terminated at the time the letter was written, and it also contained an indirect threat to commit forgery and such a communication is never privileged.

2. The proponent, having voluntarily gone upon the stand as a witness upon the general subject, waived the right in any event to object to the examination of Judge Phelps. Section 734, L. O. L. She also told Mrs. Eastland that if she could not get the property one way she would another, and the testimony is abundant to indicate a disposition on her part to secure the property of deceased by any means, fair or foul.

3. We do not believe the testimony of S. V. Knox or Della Stacey. Many persons of high respectability, acquaintances and neighbors of Knox, who have had ample opportunity to become aware of his reputation, say that it is bad. It seldom happens in a court of justice that a man's reputation is so thoroughly impeached by the testimony of disinterested persons whose opportunities of knowledge are the very best. It is true that some persons of respectability testify to his good reputation, but those who have known him best and longest speak otherwise, and they are greatly in the majority.

The witness Della Stacey, daughter of Louis Ragle, one of the reputed witnesses of the will in question, is also shown to be a person of bad reputation and vicious habits. It is needless to dwell in detail on her life as a girl and woman. It is such as to entirely discredit any statement she might make on any disputed question of fact.

The will is dated November 21, 1893, and Knox testifies that he went into Young's hardware store to buy something, and that Young called him to sign as a witness. The evidence shows that Young did not purchase the store until early in December, rendering it very unlikely that he was there in charge at the date of the supposed will. Witness Stagg testifies that he sold the business to Young early in December. The testimony of Knox is vague and uncertain in many particulars. He stated to Hall and Watts that he knew nothing that would be of benefit to either side, which, if his present testimony

is true, was an absolute falsehood. It is in evidence that Young disliked Knox and warned persons to have nothing to do with him, as he was a fool and dishonest. Ragle's name is written on the document by the same person who wrote the body of it, and what purports to be his mark appears on the instrument. He was an illiterate, unreliable drunkard. The evidence shows that Hall was constantly in the store until the spring of 1894, and it is inconceivable that Young, who was a careful, prudent business man, would have passed him by to select men, one of whom he thought dishonest and a fool, and the other a drunken sot, who could not write his own name, to witness the most important document he had ever executed. There is usually some sentiment which comes to the surface when a man sits down to execute his last will. He generally calls on his nearest and closest friends to witness his signature, and selects persons who are reliable members of the community, and whose word will be received when his own voice is silenced by death. He deposits it in the custody of some reliable person and tries to make sure that it will be preserved. But proponent would have us believe that James W. Young did none of these things. In the light of the evidence we would be compelled, in order to sustain this document, to believe that, disregarding the care and attention that he devoted to the preparation of his first will—the one drawn up by Parkes—he chose to write his own will with a pencil, upon a scrap of paper, and call in two of the most worthless characters in the community to witness it; and this in the face of the fact that the will regularly drawn up by Parkes was then in existence; that he deposited this document with some unknown person who had not the decency to declare its existence or to disclose his own name; that he made no mention of his prior will and did not destroy it, and told none of his intimate friends that he had made a second will. In view of his careful business habits this is incredible. Della Stacey's account of the execution of the will is full of improbabilities. She testifies that she, her father, Norman

Young, Knox, and J. W. Young were in the store of J. W. Young at Weston; that she was then about seventeen years of age; that Young called her father and Knox to witness on paper and when they asked him what it was he said, "Well, if you must know, it is my will"; that he then signed the paper and handed it to Knox who signed it; that Young then wrote something and handed it to Ragle who made his mark; that Young then folded it, put it in a black pocketbook and placed the book in his inside coat pocket. She carefully described the size and color of the pocketbook, which corresponds very closely with the one which proponent claims to have received with the alleged will when it came to her through the mail. Witness testifies that she was standing about 12 feet from Young when all this took place, and yet she remembers distinctly everything that was said and all that was done after a lapse of 16 years. That a girl of seventeen years, with no particular reason for noticing or being interested in the transaction, should attend to and remember all these details is not probable. It is absolutely certain that she was not in Weston on the 21st day of November, 1893, the date of the will. She was a witness in a criminal case in La Grande, 45 miles away, on the 20th. After this cause arose, and it was known that she would be a witness, it came to her knowledge that a detective was in La Grande looking up her record, and it would have been dangerous for her to swear that she was in Weston on the 21st, so she fixes a later date. Though she went by another route, she reached home as soon as possible, by claiming that she rode across the country on horseback. But she was not there on the 21st, so that to sustain her story it must be assumed that the date of the will is incorrect. The very last thing that a man is likely to date incorrectly is his will. She was an old-time friend of proponent, and just the sort of a person she would naturally select to aid her in a scheme to manufacture evidence to fit her contention. The evidence does not show proponent's course of life to have been such as to entitle her to much credit

as a witness. An associate and intimate friend of Della Stacey in girlhood, and after her marriage living apart from her husband and children, wandering around over the country with itinerant vaudeville shows, where she was engaged in "singing and dancing, rag dancing, Spanish dancing, Scottish dancing, and buck and wing dancing," she does not present an attractive picture of American motherhood and womanhood. There is some evidence tending to show that, during her early girlhood, deceased entertained a strong affection for her, but that later, probably from her own misconduct and disregard of his wishes, and possibly from a mere whim, this regard changed to indifference or positive dislike. Grace Rogers testifies that "Young was sulky with her, and I have every reason to believe his dissatisfaction was about her association with Della Ragle." The same witness also testified that in the fall of 1893 Young referred to Mabel and her mother as that "damned outfit," and said that after she left she had stolen his ring, and that when he met her afterwards in Pendleton he refused to shake hands with her. She went away with her mother in the fall of 1893, and the mother subsequently sued Young for $62 as wages for Mabel while she was with him. Referring to this action in a conversation with Mrs. Meiners, he said, "The devil would get mad. I thought I was done with them people, but they have sued me again for wages." To Mrs. Phillips he said that this was the last he ever intended to do, and he hoped he was through with the accursed family. It is worthy of notice that the will now in question bears date of November 21, 1893, the very day this suit for wages was settled in Pendleton. It seems very improbable that deceased would select this very time to write a will in favor of proponent, and it is quite probable from the testimony that he was in Pendleton on that date, settling what he deemed an unjust action brought against him in proponent's behalf.

The will itself, and the letters and exhibits presented by proponent for comparison, while fairly skillful imitations of the handwriting of deceased, differ from it in

many important particulars. Deceased was a poor penman and worse in his orthography, and while a fairly good business man was evidently a man of little education. In many instances, upon his books and checks, the name of I. H. Saling appears and he invariably spelled it incorrectly "Sailing." In the supposed will it is correctly spelled. It is hardly probable that he deviated in this one single instance from his invariable habit, both before and after, of spelling the name. Deceased had also an almost unchangeable habit of making a capital "I" approximately thus, "$\mathcal{G}$" or "$\mathcal{G}$," the stem being made first and the upper turn being completed by a separate stroke of the pen, and always touching or projecting beyond and to the right of the top of the stem. In several score of instances, occurring in his genuine writings, there appears only one where this manner of making the letter has not been followed. In the proposed will and alleged letters to Clara Young, and proponent, and in the memoranda in the pocketbook the prevailing type of capital "I" when viewed under a microscope appears approximately thus "$\mathcal{G}$" or "$\mathcal{G}$," the glass revealing a distinct space between the stem and the upper turn of the letter. In his true writings he had a characteristic and very unusual way of making a capital "N," thus "$\mathcal{N}$," the upper turn and downward stroke at the last never being omitted. In the supposed will and in the letters and memoranda above alluded to the capital is made approximately thus "$\mathcal{N}$," showing a fairly well made standard capital "N" not seen in any of his other writings and with the upper turn and shading at the end of the letter entirely omitted. Another common characteristic in his writing was when writing words containing "th" he would cross both the "t" and the "h," thus "$th$" or "$th$." In the alleged will and other documents referred to these letters are crossed approximately thus, "$th$" or "$th$" or "$th$,"

the "t" itself not being crossed.   In the letters before referred to the words "letter" and "better" are properly spelled, and in other genuine letters they are misspelled "leter" and "beter."

There are many other marked differences between these exhibits and his genuine writings, but it is useless to prolong this opinion by citing examples.   There is a marked resemblance in these documents in some respects to the genuine writings of deceased, but such resemblance is the essence of every forgery.   The imitation is clever, but that is all.   It is a fact known to everybody that the handwriting and spelling of an uneducated man does not vary greatly.   What he has learned with difficulty and does with difficulty he usually does in the same manner every time.   Unlike the skillful penman he is unable to make the same letter several times in different ways, and unlike the educated man he does not correct his mistakes in spelling.   And if the differences between the genuine writings of deceased and those relied upon by proponent were the only evidence in this case, they would be sufficient to stamp all these documents as forgeries. But they do not stand alone.   Witnesses of the highest respectability, who are familiar with Young's handwriting—clerks, bankers, and public officials—testify that proponent's exhibits are forgeries. Experts of long experience bear the same testimony, the preponderance in the weight of evidence of this character being largely in favor of contestants.

Proponent also raised the question that the will drawn by Parkes is a forgery and that the signature of deceased thereon is a tracing.   An expert, called by proponent, promptly declared the signature a tracing.   We have carefully examined the signature under a microscope and there is little doubt that a pen with different colored ink has been run over the original letters in the name of Young.   So that notwithstanding the respectability of the witnesses to the will and their apparently straightforward

testimony, if it had been shown that the will when presented for probate was in the same condition that it now appears there would be a strong presumption against its genuineness. But it is shown that the will has not been always in the custody of the clerk, and that it has been taken out of the office for the purpose of examination and that proponent has had access to it. The theory of contestant is that the signature has been tampered with since the commencement of these proceedings with a view to casting a doubt upon its validity.

Charles Marsh, who knew Young's handwriting and is himself an expert in handwriting, testifies that the signature had apparently been changed after he first examined it. Hon. John McCourt, United States district attorney, Judge Fee, Judge Lowell, Frederick Steiwer, Frank Saling, county clerk, and Joseph Parkes, all of whom had had occasions to examine the will carefully, some of them examining it through a magnifying glass, all testify that the signature has apparently been tampered with since the institution of these proceedings and since they first examined it, and the preponderance of testimony indicates that such is the fact, and we so find.

We are of the opinion that the will drawn by Parkes is the genuine will of James W. Young. Much more might be added in support of the views here announced, but as no disputed questions of law arise, we refrain from incumbering the reports of this State with a longer discussion of facts. The case is an unique one, and, in our judgment, a daring conspiracy to defraud and loot the estate of J. W. Young by means of forged documents, supported by perjured testimony.

4. A motion to dismiss the appeal in this case is filed for the reason that Caroline Phillips died prior to the appeal, and that there has been no substitution and no notice of appeal served upon the representatives of her estate. The statute of this State provides that "any party to a judgment or decree * * may appeal therefrom," etc.

Section 549, L. O. L. "The party desiring to appeal may cause a notice, signed by himself or attorney to be served on such adverse party or parties as have appeared in the action. * * Such notice shall be sufficient if it contains the title of the cause, the names of the parties, and notifies the adverse party or his attorney that an appeal is taken to the Supreme or circuit court as the case may be, from the judgment, order, or decree, or some specified part thereof." Section 550. By "adverse party" we think the statute means an adverse party on the record. All the contestants appeared together by the same attorneys and for the same purpose and their interests are identical and not adverse. The decree was against all the defendants, including Mrs. Phillips, and went to the status of a particular instrument, to wit, the will. The allowance of costs is incidental to the decision on the principal subject —the validity of the will. Proponent saw fit to take a decree against all the contesting parties after the death of Caroline Phillips and without substitution, but the decree is an entirety. If the proposed will is void, it is entirely void. It cannot be valid as to Caroline Phillips and void as to the other contestants. The probate court cannot permit administration on it as to her and refuse to permit administration as to the other contestants. Its only course is to refuse to have anything to do with it. Any one of the contestants might have appealed this suit and a victory for him would have resulted in a reversal of the decree of the court below, declaring the will a valid instrument, and when that decree is obtained the judgment for costs will fall with it.

The decree of the circuit court is reversed and the contestants who have appealed will have a decree in their favor for the costs in this court and the circuit court.

REVERSED.

MR. JUSTICE BEAN took no part in this decision.

Decided August 1, 1911.

## ON PETITION FOR REHEARING.

[116 Pac. 1060.]

MR. JUSTICE MCBRIDE delivered the opinion of the court.

The petition for rehearing in this case is based solely upon the failure of contestants to serve a notice of appeal upon the personal representatives of Mrs. Caroline Phillips, who died pending the hearing of this cause in the circuit court.

The facts of the case are these: Mrs. Phillips and the other contestants appeared together in the county court to contest the validity of the will presented by Mabel Warner, proponent. In that court they procured a decree, declaring the proposed will a forgery, and void. Proponent appealed from this decree to the circuit court, and, pending a hearing in that court, Mrs. Phillips died. No substitution was made, and the cause was heard and determined as though Mrs. Phillips were alive, and the decree of the county court was there reversed, and a judgment for an unspecified amount of costs was entered against all the defendants, including Mrs. Phillips. The contestants appealed to this court, and here, for the first time, on motion to dismiss the appeal, counsel for proponent suggested that Mrs. Phillips was an adverse party; that counsel could not appear for her on this appeal without substitution; and that, as her legal representative had not been so substituted, all adverse parties had not been served, and therefore that the attempt to appeal was nugatory.

5. This court has not yet decided whether a judgment, given against a person who dies before the hearing and submission of a case, is void, or whether it is merely voidable, and the authorities are hopelessly divided upon that subject. But upon every principle of reason and justice such a judgment ought to be held an absolute nullity. Mrs. Phillips at her death had a decree in her

favor, conferring upon her valuable property and pecuniary rights. Her death revoked the authority of counsel to appear and represent her or her estate in the circuit court. The decree of the circuit court attempted to take these rights away and further to give a personal judgment against her for costs. While many courts, and perhaps a majority, have held that such a judgment is voidable, and not void, their reasoning does not convince us that a judgment against a person not in existence is anything other than wholly void, or that it can possibly bind any one. It may well be granted that, where a cause has been argued and submitted and the decision is in the breast of the judge, and nothing remains but the ministerial act of causing it to be recorded, this function may be performed *nunc pro tunc* after the death of a party or where default has been taken, and before entry of judgment the death of a party occurs, the entry of judgment, which is a mere ministerial act of the clerk, may be proper and regular; but that, where death occurs before a hearing upon the merits, the court may pass judgment upon the rights of a decedent, and deprive him or his unrepresented estate of valuable property, is a proposition so illogical and unjust that we cannot assent to it, even though decisions parroted down from one court to another, with hardly a pretense of reasoning to support them, may preponderate in number over those holding the contrary doctrine.

6. At common law a suit was abated by the death of a party. 2 Mod. 308; 2 Saund. 72 M. This rule is relaxed by Section 38, L. O. L., which provides that the action shall not abate by the death of a party, if the cause of action continue or survive, and that the court, at any time within one year thereafter, on motion, may allow the action to be continued against his personal representatives or successors in interest. The effect of this section is to suspend the suit until such substitution is made. *McBride* v. *N. P. R. R. Co.,* 19 Or. 64 (23 Pac. 814).

It is conceived that such suspension has the same temporary effect on the rights of the parties as though the suit were actually abated; that neither party can move in the case until a substitution is ordered; and that during the interval between the death of the party and substitution of his legal representatives the disabilities of either party remain the same as at common law.

Commenting upon an act similar in terms to that in force in this State, the Supreme Court of Illinois say: "In the nature of things, the deceased defendant cannot plead in abatement, or otherwise interpose the fact of his own death, and his legal representatives, until brought into court by the plaintiff, as contemplated by the statute, are not supposed to be present, or to know anything about the pendency of the suit; and to hold a judgment obtained under such circumstances binding upon them would seem, not only inconsistent with well-settled principles, but would probably lead to the perpetration of great frauds. We are, therefore, clearly of opinion that such judgments are, as already stated, absolutely void." *Life Association of America* v. *Fassett,* 102 Ill. 315, 328. Among other cases holding to the same effect may be cited *Tarleton* v. *Cox,* 45 Miss. 430; *New Orleans & C. R. Co.* v. *Bosworth,* 8 La. Ann. 80; *McCreery* v. *Everding,* 44 Cal. 284; *Lynch* v. *Tunnell,* 4 Har. (Del.) 284; *Meyer* v. *Hearst,* 75 Ala. 390; *Guyer* v. *Guyer,* 6 Houst. (Del.) 430; *Weis* v. *Aaron,* 75 Miss. 138 (21 South. 763: 65 Am. St. Rep. 594) ; *Kager* v. *Vickery,* 61 Kan. 342 (59 Pac. 628: 49 L. R. A. 153: 78 Am. St. Rep. 318). Many other cases might be cited to the same effect and quite as many, perhaps more, to the contrary; but from a consideration of the rule as it existed at common law, and giving our statute a fair and reasonable construction, we do not believe that the common-law rule has been so far abrogated as to permit a trial and decree upon the merits as against a dead person, and that such decree is an absolute nullity.

We do not understand that decisions of this court hold the contrary. In *Mitchell* v. *Schoonover*, 16 Or. 212 (17 Pac. 867: 8 Am. St. Rep. 282), a defendant, duly served with summons, appeared and demurred to the complaint. The demurrer was overruled, and he failed to plead further. Being in default for want of answer, the plaintiff took judgment against him. He died on the same day. The judgment against him was held valid upon appeal. But in that case the defendant was in default before his death. Nothing remained to be done but to enter the judgment, which was a mere ministerial act of the clerk, flowing naturally from the default. In considering cases of this character, courts have not always been careful to distinguish between the rendition of a judgment, which is a judicial act, and the mere entry of a judgment on the record, which is a ministerial act, and from failure to make this distinction have been frequently led into the illogical and mischievous position of holding that a valid judgment could be rendered against a person not then in existence—a mere memory.

7. Technically speaking, the transcript discloses no decree in favor of proponent for costs that could in its present condition be enforced against anybody. The amount of the taxed costs nowhere appears in the decree, which adjudges that she recover "her costs and disbursements herein sustained and expended on this appeal; and the costs and disbursements for transcript on this appeal; and the costs and disbursements paid the stenographer for extending stenographic notes of the testimony of witnesses taken in the trial in the court below amounting to $——; and that she recover from respondent all her costs and disbursements in the county court sustained and expended in this cause to be taxed, and that execution issue therefor." Such a judgment is a nullity as to costs, until they are properly taxed and entered in the judgment. Black, Judg. (2 ed.) § 118. Whatever may be the condition of the law in cases where the success of

one plaintiff upon appeal may impose an additional burden upon a co-plaintiff, who has not joined in the appeal or been served with notice thereof, we are satisfied that in this case no such burden can be thrown upon the estate of Mrs. Phillips, and that therefore she is not an adverse party, within the meaning of our statute.

The petition is denied.

REVERSED: REHEARING DENIED.