Argued December 15, 1921, reversed and remanded March 21, 1922.

## COLE *v.* JOHNSON ET AL.

### (205 Pac. 282.)

**Husband and Wife—Refusal to Grant Nonsuit was not Error Where
the Evidence Would Support a Verdict for Plaintiff.**

1.   Where there was ample evidence to warrant finding for plain-
tiff upon every issue raised by the pleadings in suit for alienation
of affections, nonsuit was properly refused.

**Husband and Wife—Evidence Held to Sustain a Verdict for the
Husband for Damages for Alienation of Wife's Affections.**

2.   In a suit for alienation of wife's affections brought against
her brother and aunt and another, evidence *held* to sustain a verdict
for plaintiff.

**Appeal and Error—Objection and Exceptions Below to Misconduct
of Counsel are Necessary for Review.**

3.   The question of misconduct of plaintiff's counsel upon trial
cannot be reviewed upon appeal in the absence of objection and
saving of exceptions below.

**Appeal and Error—Where Interrogatory was Disapproved by Court
and Witness Prevented from Answering, Held That the Matter
was not Prejudicial.**

4.   In a suit for alienation of wife's affections, where an objection
was made to an interrogatory by plaintiff's counsel, but a dis-
approving remark of the trial judge prevented the witness from
answering, *held*, that the defendants were not prejudiced.

Witnesses—In Suit for Alienation of Affections, Attorney's Testimony Naming Defendants as Guarantors of His Fees in Suits by the Wife Against Plaintiff Held Admissible.

5. In a suit for alienation of wife's affections brought against her brother and aunt and another, testimony of an attorney that he had prepared papers in suits by the wife for divorce and for alienation of affections at the instance of certain of the defendants, naming them, *held* proper, since no peculiar circumstances rendered it incompetent for him to reveal the names of his clients or those guaranteeing payment for his services.

Appeal and Error—Privileged Communications Held Harmless Because of Other Testimony.

6. If an attorney in a suit for alienation of affections of plaintiff's wife testified to privileged communications made by one of the defendants, any error committed therein was rendered harmless, where the defendants all voluntarily' testified as witnesses in their own behalf, fully and at length, as to the particular matters of the objectionable communication, in view of Section 734, Or. L., relating to waiver of privilege.

Husband and Wife—In Suit for Alienation of Wife's Affections, His Testimony That Defendants Appeared as Witnesses in the Wife's Divorce and Annulment Suits Held Proper.

7. In a suit for alienation of wife's affections brought against her brother, aunt and another, it was proper to permit plaintiff to testify that these defendants and another brother of the wife had appeared as witnesses in the wife's divorce suit and also in her annulment suit against the plaintiff, in view of plaintiff's charges that the defendants had induced the bringing of such suits.

Appeal and Error — Witnesses — Form of Question to Witness Held Improper, but in View of the Answer not Prejudicial.

8. In a husband's suit for alienation of wife's affections against his wife's brother and aunt and another, in which defendants were charged with being instrumental in the bringing of divorce and annulment suits against plaintiff, while the question asked plaintiff as to the charges in such suits, "state whether or not there was any truth in them," was objectionable as to form, yet, under the circumstances, the question and plaintiff's answer, "No," did not harm the defendants, where plaintiff testified in detail concerning all that occurred during the times in question in both suits.

Appeal and Error—Parties, Having Introduced Witness to a Conversation, Held not in Position to Object to Other Parties Testifying Thereof.

9. In a suit for alienation of wife's affections, where plaintiff, a witness in rebuttal, was asked to tell of a meeting that he had had with his wife after their separation, *held*, that the defendants, having permitted the wife to give her version of the meeting, were not in a position to object to the husband's version.

5. On privilege of attorney against revealing identity of client, see notes in **Ann. Cas.** 1913A, 29; **L. R. A.** 1916C, 602.

Husband and Wife—Under Pleadings in Husband's Suit for Alienation of Affections Charging Defendants With Inducing Wife's Divorce and Annulment Suits, Pleadings and Decrees in Such Suits Held Admissible.

10. In a suit for alienation of wife's affections, alleging that the defendants were instrumental in the bringing of divorce and annulment suits against the plaintiff, the pleadings and the final decrees in such suits were competent, but the findings of fact and conclusion of law were not competent; the defense being that the wife was virtually compelled to marry the plaintiff under duress.

Trial—Overruling General Objections to Exhibit not Error, Where Part was Competent.

11. Where, in a suit for alienation of affections, the pleadings and decrees in other suits were admissible, but the findings and conclusions not admissible, and the papers were offered as a single exhibit, an objection to the exhibit as an entirety was properly overruled.

Appeal and Error—Questioning Sheriff as to His Attempt to Locate Defendants Held not Reversible Error.

12. In a husband's suit against his wife's brother, aunt and another for alienation of wife's affections and with having enticed and taken away plaintiff's wife, permitting the sheriff, to whom a warrant had been delivered for the arrest of the parties, to state what he did in his attempt to locate the persons after going to the county seat of another county in which they were, *held* not reversible error.

Witnesses — In Suit for Alienation of Wife's Affections, Cross-examination of Wife if She Expected to Marry One of Defendants Held Proper.

13. In a suit for alienation of the affections of plaintiff's wife, permitting the wife to be asked on cross-examination whether or not she intended to marry one of the defendants after she got free from her husband, where her answer was, "No," *held* competent.

Appeal and Error —Exclusion of Deed of Reconveyance Harmless in View of Evidence Relating Thereto.

14. In a suit for alienation of wife's affections against her brother and aunt and her former fiancé, where a deed of the latter's property to another had been put in evidence, sustaining an objection to receiving an original deed (Or. L., § 9870) reconveying such property *held* not injurious, where such defendant as a witness had twice stated that the property had been reconveyed and that he had subsequently sold it.

Husband and Wife — In Alienation Suit Where the Defendants Claimed the Wife was Compelled to Marry Under Duress, Her Statement That She Urged the Defendants to Hurry Her Away in the Automobile Held Admissible.

15. In a husband's suit against his wife's brother and aunt and former fiancé for alienation of the wife's affections, where the defendants claimed that the wife was forced to marry plaintiff under duress, permitting the wife to testify that when she got in an automobile with some of the defendants she told them to drive as fast as they could so that her husband would not catch them *held* com-

petent under the circumstances attending her hurried departure, and as explaining evidence of their fast driving, while her answer that she wished them to hurry because her husband had two revolvers and would use them was incompetent.

**Husband and Wife—If Defendants Intentionally Alienated Plaintiff's Wife's Affections, It was not Necessary That It be Done for an Immoral Purpose to Entitle Plaintiff to Verdict.**

16. If defendants by their intentional acts or conduct alienated the affections of plaintiff's wife, or by such means caused her to remain away from her husband, then liability did not depend on whether it was done for an adulterous or immoral purpose.

**Appeal and Error—In Suit for Alienation of Affections, Refusal to Submit Defendants' Theory of Acting in Good Faith Held Error.**

17. In a husband's suit against his wife's brother, her aunt and her former fiancé for alienation of her affections, where the defendants' theory was that the wife married plaintiff under duress, refusing an instruction on the good faith of defendants *held* reversible error.

**Husband and Wife—In Suit for Alienation of Wife's Affections, the Defendants cannot Claim the Same Protection as Parents, Where the Evidence Fails to Disclose the Necessary Special Circumstances.**

18. In a suit for alienation of a wife's affections, even if it be assumed that near relatives under special circumstances would be entitled to the same protection as parents, the defendants cannot claim any such protection where the evidence fails to disclose the necessary special circumstances.

From Columbia: JAMES A. EAKIN, Judge.

Department 1.

This is an action brought by Robert Cole against A. Johnson, Alice Blackwell and Lester Williamson to recover damages for the alienation of the affections of LuElsie Cole, the wife of plaintiff. A trial resulted in a verdict and judgment for the plaintiff for the sum of $15,500; and the defendants appealed.

Lester Williamson is a brother and Alice Blackwell is an aunt of LuElsie Cole. Estes Williamson and Ray Williamson are also brothers of LuElsie Cole. Johnson was a fiancé of LuElsie, for they had been engaged during the period of four years prior to her marriage to Cole on March 7, 1918. Johnson had prepared and furnished a home in Portland, and he

and his fiancée were to have been married on March 9, 1918. According to the story of the plaintiff, he proposed to LuElsie in January, 1918, for he testified: "We practically had it settled that we would get married in April." The plaintiff lives in St. Helens about thirty miles from Portland; and LuElsie resided in Portland. On March 1st, LuElsie addressed a letter to Robert asking him to come to Portland, and this letter can be fairly construed to mean an invitation to the plaintiff to come to Portland and to marry LuElsie without delay. Robert wrote two letters. These letters are set out in full in *Cole* v. *Cole,* 97 Or. 555 (192 Pac. 637). According to the plaintiff, he went to Portland on Sunday, March 3d, and saw the defendant, and then returned to St. Helens. On Wednesday, March 6th, the plaintiff went from St. Helens to Portland and that night met LuElsie, when they drove to Oregon City for the purpose of getting married. It was late at night when they arrived at Oregon City, and, not being able to have the ceremony performed, they returned to Portland, where they remained overnight. The next day Thursday, March 7th, they again went to Oregon City, but, inasmuch as the plaintiff had no acquaintance there who could make the affidavit necessary to secure a marriage license, they returned to Portland. When the plaintiff and LuElsie reached Portland they drove in the plaintiff's automobile directly to the Fobes Supply Company's place of business, where they met C. M. Will and W. C. Foss, who were business acquaintances of the plaintiff. Robert, LuElsie, Will and Foss then went to the courthouse, procured a marriage license, and then drove to the Congregational Church, where the plaintiff and LuElsie were married by the pastor of that

church.    After the marriage the plaintiff and his wife drove to Salem and remained there overnight.    The next day, Friday, March 8th, the plaintiff and his wife motored through Portland and on to Vancouver, Washington, where they stayed Friday night.    The next day, Saturday, March 9th, they drove to Hood River, "turned around and came back" to Portland, registered at the Clifford Hotel and remained in Portland until Monday, March 11th, when they motored to St. Helens, arriving there early in the afternoon.    Upon the invitation of Mr. and Mrs. H. F. McCormick, the plaintiff and his wife took dinner with the McCormicks at the latter's residence and remained as guests of the McCormicks over Monday night.    The next day, March 12th, the plaintiff found it necessary to go to a place known as the "little mill" to fix a motor.    The plaintiff went in his automobile and his wife accompanied him.    H. F. McCormick is manager of the St. Helens Lumber Company and Mrs. H. F. McCormick works in the mill office.    The plaintiff and his wife were together most of the time on Tuesday until about 4:30 P. M., when he procured from Mrs. McCormick the key to the McCormick residence and took his wife to the McCormick home and left her there alone with the understanding that he would soon return.    The plaintiff had invited the McCormicks to take dinner with him and his wife that evening at a restaurant, and Mrs. Cole knew of the arrangements which her husband had made for dinner.

Lester Williamson, with the assistance of Johnson, arranged with J. Smith, of Portland, for the use of the latter's automobile.    Lester went to St. Helens on a train at about noon of the 12th.    On the afternoon of the 12th, after his arrival in St. Helens,

Lester telephoned to Estes and to Alice Blackwell, with the result that late that afternoon Estes Williamson, Alice Blackwell and Johnson, together with a chauffeur, motored to St. Helens in the Smith car. Lester Williamson met the Smith car a short distance out of St. Helens. The party in the car drove into St. Helens and stopped the car not far from the McCormick home. Estes and Lester Williamson went to the McCormick residence. Lester rang the door bell and Mrs. Cole answered the bell. After a short conversation Mrs. Cole and her two brothers left the house and went to the Smith car, and with Johnson, Alice Blackwell and the driver at once left St. Helens for Portland at a high rate of speed.

A warrant for the arrest of Alice Blackwell, Johnson and Lester Williamson was issued and delivered to the sheriff of Columbia County. The sheriff left St. Helens about 9 P. M. for Portland. The sheriff was unable to locate either of the three persons in Portland that night.

On March 13, 1918, in Columbia County, LuElsie commenced a divorce suit against her husband, alleging in her complaint that she had married Robert under duress. A trial resulted in a decree of dismissal on April 2, 1918. In the record of the instant case this suit is designated as the divorce suit.

On May 25, 1918, in Multnomah County, LuElsie commenced a suit against Robert to annul the marriage, alleging that the marriage had been brought about by duress. A trial terminated in a decree of dismissal on October 18, 1918. In the record of the instant case this suit is referred to as the annulment suit.

On April 2, 1918, the plaintiff began this action. In the complaint it is alleged that on March 12, 1918,

"while plaintiff and his wife were living together happily as man and wife, the defendants wrongfully contriving and intending to injure the plaintiff and to deprive him of the comfort, society and assistance of his said wife, maliciously enticed her away from the plaintiff and his residence in St. Helens to Portland, Oregon, and have ever since harbored her and caused and influenced and induced her to there remain and live separate and apart from this plaintiff against the consent of this plaintiff."

It is further alleged in the complaint that on March 13, 1918, the defendants induced LuElsie to commence the suit for divorce which she began in Columbia County and induced her to charge in her complaint that Robert had by force and duress compelled her to marry him. On April 11th an answer was filed. On October 26, 1918, a supplemental complaint was filed, and two days afterwards, the defendants moved to strike out certain parts of the supplemental complaint and to make the pleading more definite in certain respects. On January 16, 1919, the court denied the motion, except in two particulars. On January 20, 1919, the plaintiff filed an amended supplemental complaint, alleging that since the commencement of the action for damages the defendants instituted in the name of LuElsie the suit against Robert in Multnomah County to annul the marriage. The amended supplemental complaint charges that the defendants in this action were instrumental in causing the suit for the annulment of the marriage to be filed, and that they procured LuElsie to make false allegations in her complaint in that suit and to testify falsely as a witness in the trial of that suit.

The amended supplemental complaint further alleges that since the commencement of this action the defendants have persistently repeated to LuElsie

false and slanderous stories about Robert for the purpose of further alienating the affections of LuElsie and have "thereby permanently diverted and alienated the affections, respect and confidence of" LuElsie.

The defendants filed an answer to the amended supplemental complaint. The answer to the complaint and the answer to the amended supplemental complaint consisted of admissions and denials.

The assignments of error discussed in the appellant's brief relate to the refusal to grant a nonsuit, alleged misconduct of counsel, the reception and exclusion of evidence, the ruling on the motion against the supplemental complaint, the giving of instructions, and the refusal to give certain instructions requested by the defendants.    REVERSED AND REMANDED.

For appellant there was a brief and oral arguments by *Mr. G. G. Schmitt* and *Mr. L. P. Hewitt.*

For respondent there was a brief over the names of *Mr. Glen R. Metsker* and *Mr. Frederick H. Whitfield,* with an oral argument by *Mr. Metsker.*

HARRIS, J.—1. Defendants severally and jointly moved for an involuntary judgment of nonsuit. The trial court properly refused to grant a nonsuit. There was ample evidence to warrant the jury, if they believed such evidence, in finding in favor of the plaintiff upon every issue raised by the pleadings.

2. The three letters to which reference has already been made, of themselves, indicate that Robert and LuElsie understood that Robert would be in Portland on Wednesday, March 6th, for the purpose of marrying LuElsie. If the jury believed the evidence of-

fered in behalf of the plaintiff, the principal facts were as follows: At about 11 o'clock A. M. on March 6th Robert went to the Clyde Hotel in Portland and waited there until about 4 o'clock, when LuElsie called him up on the telephone and told him to meet her at Olds, Wortman & King. He met her at the designated place with his automobile and she put one of her grips in the car and told him that she wished to spend the evening with her brother Estes and that she would call Robert about 10:30 P. M. that night at the Clyde Hotel, when they would leave together. She did call him at the appointed time and asked him to meet her at 446 Taylor Street. She was waiting on the street when he drove up in his car, and after putting into the car two additional suitcases packed with her clothes and belongings they went to Oregon City, but as previously explained they were unable to be married and returned to Portland.

There was ample evidence upon which the jury could find that every step taken by LuElsie from March 1st until her arrival at St. Helens on March 11th was taken freely and voluntarily. Moreover, there was ample opportunity for her to withdraw prior to the performance of the marriage ceremony, and there were many opportunities for her to complain and leave the plaintiff even after the ceremony had been performed. Robert was not with LuElsie a part of the time Wednesday night. When they went to get Will and Foss, LuElsie remained in the car on the street in the business section of Portland for at least ten minutes while Robert was inside talking with Will and Foss. LuElsie remained in the automobile alone while Cole, Will and Foss went to the clerk's office in the courthouse and obtained the marriage license. LuElsie remained in the automobile

with Will and Foss standing on the curb while Cole went to the pastor's private study in the church building. On Sunday, March 10th, while motoring in Portland they broke a spring of their car and left it at 19th and Washington Streets for repairs and from there they walked to the Seward Hotel at 10th and Alder Streets and ate dinner there, and then walked on over to the Clifford Hotel on the east side a distance of approximately a mile and a half through the center of the business district of Portland. On Monday morning Robert left LuElsie at the breakfast-table in a restaurant near the Clifford Hotel while he went to get his automobile a mile and a half away. When he returned to the hotel she was waiting for him with her things packed. They drove over to Olds, Wortman & King, one of the large department stores in Portland, and she went into that store alone, leaving him on the street in the car. She purchased a waist and they then drove to St. Helens. There was evidence to the effect that on the evening of March 11th she expressed a wish that they get settled and that he might hurry and find a place to start housekeeping and that life was what one made it. The next day, Tuesday the 12th, Robert and his wife drove around and out of St. Helens. At one time, while he was attending to his duties as superintendent of the light company, he left her in the automobile alone for an hour and a half while he was a quarter of a mile away attending to some work. There was evidence to the effect that during the afternoon of Tuesday, March 12th, LuElsie was in good spirits and a happy frame of mind.

On March 8th Alice Blackwell and Johnson called at the courthouse of Multnomah County for the purpose of inspecting the marriage records and obtain-

ing the names of Will and Foss. Alice Blackwell telephoned to Will and on that day inquired about the marriage and as to the whereabouts of Robert and LuElsie. Alice Blackwell and Johnson on that same day called at 446 Taylor Street, got LuElsie's trunk out of her room and put it into Johnson's automobile and carried it away.

Mrs. S. C. Morton, who lives in a house adjoining the McCormick residence, saw all that occurred when Estes and Lester Williamson went to the McCormick residence. According to the testimony of Mrs. Morton, LuElsie had apparently dressed for dinner; she had changed her clothes; her hair was neatly combed and arranged; she was dressed in a shirtwaist and a skirt. According to the testimony of witnesses for the plaintiff, Johnson was not in his room at the Nortonia Hotel at any time Tuesday night, the 12th, nor was he there for a number of days following. His mail accumulated uncalled for. His automobile remained uncalled for in a garage. On March 13th, the day following the trip to St. Helens, Johnson deeded his property to J. J. Noonan, Jr.

About 8 o'clock A. M. on March 13th Lester Williamson telephoned to M. J. MacMahon, an attorney who had acted as Johnson's attorney on prior occasions, and soon thereafter Lester and his brother Estes went to MacMahon's office and took MacMahon out to the residence of Ray Williamson, where Mrs. Cole had been left the night before.

During the night of March 12th the sheriff of Columbia County together with an officer from Portland attempted to find the defendants. According to testimony of witnesses for the plaintiff, Alice Blackwell was not at her home, nor could she be found at the place where she had been working.

On about March 14th LuElsie was taken to the home of a friend on the Columbia Highway and a day or so later to the home of Mrs. Bernard, who was a friend of the defendant Johnson.

On Saturday, March 16th, pursuant to an arrangement made with M. J. MacMahon, the attorney, Robert saw and talked with LuElsie at the Imperial Hotel. She refused to return with him or have anything to do with him. According to Robert, she told him at that time that her "folks" had put detectives on his trail and found out what kind of a man he was in San Francisco. The plaintiff contends that Alice Blackwell and the Williamsons were the only "folks" and with Johnson were the only people closely connected with the alleged enticement of LuElsie. There are many details in addition to those already related which, if true, tend to support the theory of the plaintiff. The defendants offered evidence which contradicted the testimony of the witnesses for the plaintiff. There was evidence to support the theory of the plaintiff. There was evidence to support the theory of the defendants. The question was one for the jury to decide. The finding of the jury was in favor of the plaintiff and there was ample evidence to support the conclusion of the jury.

3. The defendants contend that one of the attorneys for the plaintiff was guilty of misconduct during the trial. The first instance (Bill of Exceptions, p. 82) is one where the defendants made an objection and a request for an instruction. The court sustained the objection and then gave the requested instruction. Moreover, the defendants did not save an exception.

4. The next instance (Bill of Exceptions, p. 85) there was a suggestion by the defendants that the attorney for the plaintiff be seated and not stand over

the witness; but there was neither an objection made
by the defendants nor an exception saved by them.
However, we infer from a remark made by the trial
judge that nothing reprehensible occurred. The con-
cluding remark made by one of the attorneys for the
plaintiff could not have created any prejudice, es-
pecially when considered in the light of some testi-
mony as to what the plaintiff had carried on the night
of the sixth. The next instance (Bill of Exceptions,
p. 86) does not alone or in combination with any other
instance constitute reversible error. There was an
objection to an interrogatory, but a disapproving
remark by the trial judge prevented the witness from
answering. The defendants were not prejudiced by
this occurrence.

5. When LuElsie, the defendants, and Estes Will-
iamson reached Portland Tuesday evening, March
12th, LuElsie was taken to the home of her brother,
Ray Williamson, on the east side of the river. The
next morning, March 13th, at about 8 o'clock Lester
and Estes, who had stayed on the west side of the
river overnight, went to the home of their brother
Ray and while there telephoned to M. J. MacMahon
a lawyer with offices in the Worcester Building.
Soon after this conversation on the telephone, Lester
and Estes went to the office of MacMahon and then
returned with MacMahon to the home of Ray where
MacMahon talked with LuElsie for the purpose of
acquiring the necessary information for bringing a
suit for divorce. MacMahon prepared a complaint
and on that day began the divorce suit in Columbia
County. The plaintiff called MacMahon as a witness.
MacMahon said that he had never known or seen
LuElsie nor Ray nor Lester nor Estes prior to March
13th, but that he had known Johnson for about three

years and had acted as attorney for Johnson several times. MacMahon was permitted to testify over the objection of the defendants that he was "called up on the telephone by a man, the voice I did not know, and asked if I would undertake a divorce for a young woman. I asked what the grounds were and they said it was cruel and inhuman treatment. * * I told them to bring her to the office and the answer was that she was too sick or not able to go out. They asked if they could meet me at the office. I said yes, at a certain hour, and there came to the office her two brothers." The witness explained that two men, who proved to be Lester and Estes, came to his office and that they then went to Ray's home and MacMahon there had a talk with LuElsie. MacMahon was permitted to testify about communications made, as we understand the record, by Lester and by Alice Blackwell, about the trip to St. Helens on March 12th. Lester and Estes guaranteed the payment for the services to be rendered by MacMahon. During the examination of MacMahon it developed that he had been consulted as the attorney for Lester and Estes Williamson and Alice Blackwell and Johnson in connection with the warrant of arrest issued from Columbia County. It also appeared that MacMahon prepared an answer and filed it in the instant case. After MacMahon had given considerable testimony a blanket motion to strike out the testimony of the witness was made by the defendants and overruled by the court. Although there may be situations produced by peculiar circumstances where the attorney ought not to be compelled to divulge the name of his client or the name of the person who has paid or has agreed to pay for the services rendered or to be rendered by the attorney, yet no such peculiar

circumstances are present here, and it was competent for the attorney to reveal the name of his client and the names of the persons who guaranteed payment for his services: 40 Cyc. 2370–2374; 28 R. C. L. 563. See also *Ex parte McDonough,* 170 Cal. 230 (149 Pac. 566), and case note in Ann. Cas. 1916E, 327, L. R. A. 1916C, 602, and *State* v. *Gleason,* 19 Or. 159 (23 Pac. 817).

6. Some of the testimony of MacMahon included communications, and especially communications made by Lester, which were privileged, but any error that may have been committed was rendered harmless. Alice Blackwell, Johnson and Lester all voluntarily testified as witnesses in their own behalf, and each of them testified fully and at length; and in every instance where it can be fairly said that MacMahon was compelled to reveal a privileged communication made by either of the defendants, it can likewise be said that the party who made such communication to MacMahon subsequently and voluntarily testified on the same subject: Section 734, Or. L.; 10 Ency. of Evid. 237; *Knight* v. *People,* 192 Ill. 170 (61 N. E. 371). Estes and LuElsie likewise testified voluntarily at great length. However, MacMahon was not compelled to reveal any privileged communication made to him by LuElsie nor do we understand that Mac-Mahon revealed any privileged communication made by Estes. In short, some of the testimony of Mac-Mahon which was claimed to be privileged was not in fact privileged; and any error that may have been committed by compelling the revelation of such privileged communications as were made by Lester or Johnson or Alice Blackwell was removed and dissolved by the parties themselves when they voluntarily testified on the same subject: *In re Young's*

*Estate,* 59 Or. 348 (116 Pac. 95, Ann. Cas. 1913B, 1310); *Forrest* v. *Portland Ry., L. & P. Co.,* 64 Or. 240 (129 Pac. 1049); *Gerlinger* v. *Frank,* 74 Or. 517 (145 Pac. 1069); *McNamee* v. *First Nat. Bank of Roseburg,* 88 Or. 636 (172 Pac. 801).

7. The defendants say that they were prejudiced because the court refused to exclude certain testimony claimed to be incompetent and immaterial and irrelevant; and under this general heading the defendants discuss in their printed brief numerous instances where, they argue, the court committed error. The plaintiff was permitted to testify to the fact that Alice Blackwell, Johnson, Lester and Estes had appeared as witnesses in the divorce suit; and the plaintiff was also allowed to testify that Johnson, Alice Blackwell and Lester had appeared as witnesses in the annulment suit. In view of the charges made against the defendants here, the testimony that the defendants in the instant case appeared as witnesses for LuElsie in the divorce and annulment suits is so plainly competent that the mere statement of the situation ought to be sufficient: See *Johnson* v. *Allen,* 100 N. C. 131 (5 S. E. 666).

8. Referring to the complaint in the divorce suit, the plaintiff was asked to "state whether or not there was any truth in them," and was permitted to answer: "No, there is not a word of truth in it." A similar question was asked with reference to the annulment suit and a similar answer given. The form of each question was objectionable; and yet, in the attending circumstances, the defendants were not harmed in the slightest degree. The plaintiff testified in detail and at great length concerning all that occurred from October, 1917, until March 16, 1918, and later, and his testimony covered every phase of the

charge made in the divorce and annulment suits that
the marriage had been brought about by duress.

9. Arrangements were made whereby LuElsie and
her husband met at the Imperial Hotel on Saturday,
March 16th. The meeting terminated in the refusal
of LuElsie to return to her husband. LuElsie was
called as a witness for the defendants, and, over the
objection of the plaintiff, was permitted to give her
version of the conversation with her husband. The
plaintiff was called as a witness in rebuttal, and,
referring to the conversation at the Imperial Hotel,
was asked, "Can you tell the jury what conversation
took place there between you and her, and what she
said and what you said?" The witness attempted
to answer, but the attorney for the defendants inter-
rupted with the following statement:

"Wait a minute; your Honor kept us out from
giving any testimony, any statement, she made or any
statement." The court remarked: "I did not rule
that out. There was an attempt to have it ruled out,
but I did not."

And thereupon the attorney for defendants said "save
an exception," and then the witness gave his version
of the conversation. It will be observed that the de-
fendants themselves in the face of the objection of
the plaintiff required LuElsie to give her version of
the conversation, and the defendants having per-
suaded the court to rule with them were not in a
position to claim that the plaintiff could not give his
version of the conversation. As explained by the
court there was an attempt to prevent LuElsie from
repeating the conversation but the attempt failed.
Moreover, the objection of the defendants was placed
solely upon the mistaken ground that the court had
refused to permit the defendants from offering any

testimony about the conversation. If LuElsie had not been permitted to give her version of the whole conversation, the defendants would have been in a position to object to parts of the answer of Robert Cole on the ground that such parts amounted to nothing more than narratives of past occurrences, although other parts of the answer were competent at all events: 13 R. C. L. 1476.

10. The defendants complain of the admission of exhibit "O," the complaint in the divorce suit; exhibit "P," a certified copy of the amended complaint in the divorce suit; exhibit "Q," the decree dismissing the divorce suit; exhibit "R," certified copies of the answer and amended answer in the divorce suit; exhibit "T," certified copies of the complaint, answer and reply in the annulment suit; and exhibit "U," certified copies of the findings of fact, conclusions of law and decree in the annulment suit. The pleadings upon which the two suits were tried and the final decrees were competent in view of the allegations made in the complaint in the instant case that the defendants had a part in the bringing of those two suits. However, the findings of fact and conclusions of law, and especially the findings of fact in the annulment suit were not competent. In the instant case the defendants claim that LuElsie was compelled by force to marry the plaintiff, that when she left St. Helens she did so voluntarily and without any wrongful interference by the defendants, and that her leaving was for the sole purpose of freeing herself from virtual imprisonment. The plaintiff claimed that the courtship and marriage were free from force, compulsion or duress, and that the marriage was voluntarily entered into by LuElsie. In view of the

issues raised by the pleadings and the respective
contentions made by the litigants, the findings of fact,
especially findings 2, 4 and 5, were, because of the
language used in them, exceedingly harmful. But the
record is such that the defendants cannot on this
appeal disturb the ruling of the trial court.

11. The certified copies of the findings of fact,
conclusions of law and decree in the annulment suit
were attached together under one cover and with one
certificate and were offered as a single document and
marked as a single exhibit. The objection made by
the defendants was a general objection to the exhibit
as an entirety, and the defendants did not object to
the findings of fact and conclusions of law separately.
The copy of the decree was competent, and for that
reason the court did not commit reversible error in
overruling the objection, although the remainder of
exhibit "U" was incompetent: *Coveny* v. *Hale,* 49
Cal. 552; *Shatto* v. *Crocker,* 87 Cal. 629 (25 Pac. 921);
38 Cyc. 1376. See also *Hawley* v. *Dawson,* 16 Or. 344
(18 Pac. 592).

12. E. C. Stanwood, the sheriff of Columbia County
to whom was delivered the warrant for the arrest of
Johnson, Alice Blackwell and Lester Williamson, was
asked to tell what he did in his attempt to locate those
three persons, and, over the objections of the de-
fendants, he answered thus:

"Well, as soon as we got to Portland, I went up to
the courthouse and got one of the deputy sheriffs
there to go with us. Prior to that time we had
located where Johnson stayed—I don't remember the
name of the hotel, but at any rate we went to his
room and he wasn't there."

Another question was then asked, and additional ques-
tions were asked and answers given without further

objection except one which was utterly without merit. Obviously a reversal cannot be ordered on the record made in the examination of this witness.

Defendants objected to some of the testimony of Mrs. H. F. McCormick concerning statements made by LuElsie when at the McCormick home. It is not necessary to discuss this testimony further than to say that it was clearly material and competent.

13. The defendants complained because LuElsie was asked on cross-examination whether she expected to marry Johnson after "you got free from Cole." Her ultimate answer was, "no." The defendants were not injured in the slightest degree by this testimony. Moreover, the question asked was competent.

The cross-examination of Estes about his feelings towards Johnson was competent. Moreover, the answer given by him was entirely devoid of harm to the interests of the defendants.

14. By a deed dated March 1, 1918, and recorded March 14, 1918, Johnson deeded his property to J. J. Noonan, Jr. The defendants offered as evidence, but, upon objection being made by the plaintiff, the court refused to receive the original deed made by J. J. Noonan, Jr., conveying the property back to Johnson: Section 9870, Or. L.; *Knolhoff* v. *Mack,* 68 Or. 437, 447 (136 Pac. 893, Ann. Cas. 1915D, 1229). This ruling of the court could not have injured the defendants, because Johnson, who was then a witness on the stand, had twice stated that Noonan had conveyed the property back to him, and that he, Johnson, subsequently sold it; and this testimony was neither actually nor impliedly taken from the jury. Johnson testified as to how and when he acquired the property; he told about the conveyance to Noonan,

Jr., and the reasons for it; he explained the recon-veyance to himself; and he told about the mortgages and his final disposition of the property. The ruling of the court did the defendants no harm whatever.

15. LuElsie was asked by the defendants to tell what happened when she arrived at the Smith car in St. Helens and she answered:

"Well, I didn't have any wrap on, so my youngest brother put his coat on me and I got in the machine and sat in the machine with my aunt Alice and I told them to drive just as fast and hard as they could; that he would get me as soon as he found I had left.

"Q. Why did you?

"A. Because he had two revolvers and would use them if I would leave."

On motion of the plaintiff the court struck out both answers.

The second answer was obviously incompetent. In view of the issues raised by the pleadings and the the-ories advanced by the parties and in the attending circumstances the first answer was competent. The uncontradicted evidence is to the effect that the auto-mobile was driven out of St. Helens at a high rate of speed; and, indeed, there is evidence to the effect that the car was driven so fast that a bearing was burned out before Portland was reached. The testimony was competent for the purpose of explaining the fast driv-ing. Of course, the question of credibility was for the jury alone. Furthermore, what was said and done by LuElsie when she got in the Smith car was a part of the story of her departure: *Schneider* v. *Tapfer,* 92 Or. 520 (180 Pac. 107); *Pugsley* v. *Smyth,* 98 Or. 448 (194 Pac. 686). However, it is probable that the ruling of the court did not injure the defendants. Alice Blackwell and Lester Williamson both testified fully about what was said by LuElsie when she

entered the Smith car, and this testimony was of the same tenor as the answers of LuElsie which the court struck out. Indeed, the testimony of Alice Blackwell and Lester Williamson was stronger than the first answer given by LuElsie. No witness contradicted Alice Blackwell or Lester Williamson, and when the cause went to the jury there was evidence of two witnesses to the effect that LuElsie said, "Drive as fast as you can because Cole will kill us if you don't get away from him." Moreover, there was considerable testimony about the conduct of LuElsie and statements made by her when the car was stopped on account of a bearing having burned out, which statements were similar in vein to the statements attributed to her when she entered the Smith car.

The court did not commit error in refusing to give the following instructions:

"You are further instructed that the plaintiff has wholly failed to produce evidence substantiating the charges in his complaint to the effect that these defendants, or any of them, have communicated false or defamatory statements or rumors against the plaintiff to LuElsie Cole, and in reaching your verdict you must not consider any such allegations contained in plaintiff's complaint or his amended supplemental complaint."

There was evidence, circumstantial it is true but nevertheless evidence, from which the jury could have inferred that the defendants did that which the plaintiff alleged they did.

The amended supplemental complaint supplanted the supplemental complaint, and hence we are not now concerned with any ruling made by the trial court on the motion against the supplemental complaint.

16. The court did not commit error in giving the following instruction:

"If you should find from the evidence that the defendants, by their intentional acts or conduct, alienated the affections of Mrs. Cole or by such means caused her to remain away from her husband, it is not necessary to prove that it was done for an adulterous or immoral purpose, to entitle the plaintiff to receive a verdict herein."

17. The defendants requested but the court refused to give the following instruction:

"The court instructs the jury that a stranger may in good faith, acting from humanity and hospitality, receive the wife of another within his home without being guilty of harboring or enticing her away from her husband, and any person, whether relative of the wife or not, if he acts in good faith, is justified in aiding her to leave her husband's home, or in harboring her, when she asks assistance on the ground of ill treatment by her husband. If you find from the evidence that LuElsie Cole asked assistance from the defendants, or any one or more of them, on the ground of ill treatment by her husband, and that in pursuance to said request defendants, or any one or more of them aided, assisted, and befriended LuElsie Cole in escaping from the plaintiff and thereafter harbored her, acting in good faith, then they are not guilty of harboring her or enticing her, and you must find your verdict in favor of the defendants."

It was the theory of the defendants that LuElsie was compelled by the plaintiff to marry him, and that all she did from the night of March 6th until the time she left St. Helens on the 12th was done under duress, and that the acts of the defendants in assisting her to leave St. Helens was done in good faith upon her request for assistance in leaving because of the ill treatment of her husband. The defendants

were entitled to an instruction submitting to the jury their theory of the case. The equivalent of this requested instruction does not appear in the charge given to the jury; and in view of the facts disclosed by the record the refusal to give this requested instruction constitutes reversible error: 21 Cyc. 1620; *Barnes* v. *Allen,* 1 Abb. Dec. (N. Y.) 111. See also *Powell* v. *Benthall,* 136 N. C. 145 (48 S. E. 598).

18. Requested instruction No. 7, which the court refused to give, was an attempt to invoke for near relatives the same degree of protection which is generally thrown around parents, who, in good faith and acting on reasonable grounds and for the good of the child, give to the child advice leading to a separation. Even though it be assumed that such protection may be extended to near relatives under special circumstances, the defendants here cannot claim any such protection for the reason that the evidence fails to disclose the necessary special circumstances: 13 R. C. L. 1473.

The judgment is reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED.

BURNETT, C. J., and McBRIDE and RAND, JJ., concur.