Argued and submitted November 5, 1985, reassigned January 30,
affirmed November 25, 1986

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# PAUL FREDERICK JANCSEK,
*Petitioner on Review.*

## (TC 84-0117; CA A33526; SC S32026)

730 P2d 14

John P. Daugirda, Deputy Public Defender, Salem, argued

the cause for petitioner on review. With him on the briefs was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

LENT, J.

## LENT, J.

The issue is whether the court's order that defendant's lawyer produce a letter in the lawyer's possession, written by defendant to a third person, violates defendant's rights under OEC 503 (lawyer-client privilege) or the guarantees of Article I, section 12, of the Oregon Constitution or the Fifth and Fourteenth Amendments to the Constitution of the United States against compelled self-incrimination. We hold that defendant's argument on OEC 503 is not well taken. We hold that his constitutional privileges were not violated.

The following facts are undisputed. Defendant and Pamela (the victim) were married in 1982. In early 1983, Pamela moved from Ohio to Oregon. A few months later, defendant joined Pamela. Disputes of the kind that prompted the first separation arose, and in early January 1984 Pamela moved out of the couple's apartment.

On February 2, 1984, defendant wrote the following letter to Russell Bundy, defendant's former employer in Ohio:

"Dear Russell,

"By the time you read this I will more than likely be in jail in Portland, Oregon or Washington County where ever [sic] they take you when you commit an act of violence aginst [sic] someone. First of all I always told you that the most important thing in this world to me was to keep my family together always. Well I've tried but she won't let me. I'am [sic] losing everything including my kids and it's all her fault. Maybe I'am [sic] wrong, but I can't take being alone anymore. I can't take having my kids call someelse [sic] daddy.

"I love them more than anything but if I can't have them or her no one can. I'am [sic] sorry for this but something inside me is making me do this. I can't take it anymore.

"*Please allow me this last request from you and that being that if I do this act of violence aginst [sic] my wife you will help me to defend myself in a court of law, so that I can die for my crime.* [Emphasis added.] I do not want to live in this world and I will not live in this world after I commit this crime. I have only my son Sean who is 3 years old to live for but I will not live in this world and have him know I did this to his mother.

"My last request probably sounds like I'am [sic] not of

sane mind but I am of sound mind and I am sane. No one except the devil inside me is making me do this.

"People have right to life. I want the right to die. Please forgive me Russ for I know not what I have done.

"* * * * *

"And of course you Russ the only one who more than likely won't understand this, but try and forgive me please because I know God won't.

"I hope Gil will forgive me too.

"Your Friend

"Paul F. Jancsek"

Bundy received the letter about February 5.

Meanwhile, on February 3, defendant killed Pamela. A couple of hours later, defendant delivered Sean to a babysitter and gave her his important papers and a "suicide note." After reading the note, the babysitter called the police. An hour later, defendant called his sister and Ray Thomas and told them that he had killed Pamela. He also told them that he had sent a letter to Bundy stating that defendant needed help. Thomas discussed these statements by defendant with the police.

The local police asked the Ohio police to talk to Bundy about the letter to him. By the time they did so, Bundy had acceded to the request of defendant's lawyer to send the letter to the lawyer. He told the Ohio police of the general contents of the letter.

Prior to trial, the state moved for an order requiring the lawyer to produce the letter for in camera inspection to determine whether the letter should be turned over to the prosecution. Over defendant's OEC 503 and self-incrimination objections, the court ordered the letter to be produced.[1]

We first consider defendant's challenge under the

---

[1] It is not clear whether the court ordered the letter to be produced for in camera inspection or to be turned over to the state, or both, but the letter was eventually received in evidence as plaintiff's exhibit.

The exhibit was actually received without objection, but the error assigned on appeal was the granting of the motion to produce, and the state joined issue on that assignment. The state has not raised any question that the issues stated at the outset of this opinion are not properly before us.

evidence code; if that disposes of the case in defendant's favor, we need not reach any constitutional issue. *State v. Thompson,* 294 Or 528, 531, 659 P2d 383 (1983); *see also State v. Spada,* 286 Or 305, 309, 594 P2d 815 (1979). If not, we shall consider the state constitutional challenge and, if necessary, we shall consider the federal constitutional challenge. *State v. Kennedy,* 295 Or 260, 262, 666 P2d 1316 (1983).

## I.  *OREGON EVIDENCE CODE: RULE 503*

The lawyer-client privilege is the oldest of all the evidentiary privileges and is recognized in every American jurisdiction. Kirkpatrick, Oregon Evidence 146 (1982). Its purpose is the promotion of the full disclosure of information by clients. Lawyers can act effectively only when fully advised of the facts by the parties whom they represent, and a client must know that "what he tells his lawyer [in confidence] cannot, over his objection, be extorted in court from the lawyer's lips." McCormick, Evidence 205 (3d ed 1984).

In the instant case, defendant asserts that the letter written to his former employer is protected from disclosure by the Oregon lawyer-client privilege, which is codified at OEC 503 and provides in part:

"(1)   As used in this section, unless the context requires otherwise:

"(a)   'Client' means a person, * * * who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from the lawyer.

"(b)   'Confidential communication' means a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

"(c)   'Lawyer' means a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation.

"(d)   'Representative of the client' means a person who has authority to obtain professional legal services and to act on advice rendered pursuant thereto, on behalf of the client.

"(e) 'Representative of the lawyer' means one employed to assist the lawyer in the rendition of professional legal services, * * *.

"(2) A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"(a) Between the client or the client's representative and the client's lawyer or a representative of the lawyer;

"(b) Between the client's lawyer and the lawyer's representative;

"(c) By the client or the client's lawyer to a lawyer representing another in a matter of common interest;

"(d) Between representatives of the client or between the client and a representative of the client; or

"(e) Between lawyers representing the client."

We have held that the application of this privilege hinges on two findings: (1) the communication must be confidential within the meaning of OEC 503(1)(b), and (2) the communication must be made for the purpose of facilitating the rendition of professional legal services to the client. *See State v. Ogle,* 297 Or 84, 87, 682 P2d 267 (1984). That holding is incomplete as applied to the situation in this case. Another finding is essential to invoking the privilege. The communication must have been between those persons described in one of the paragraphs, (a) through (e), of OEC 503(2).

It is immediately clear that the letter from the defendant to Bundy does not fall within either paragraph (a), (b), (c) or (e). With respect to paragraph (d), the letter is not between "representatives of the client." In order for the privilege to apply, therefore, it is necessary that it be established that the communication is "between the client and a representative of the client." This can be so only if Bundy was a "representative of the client" as that term is used in the rule.

OEC 503(1) contains a list of definitions, in which "representative of the client" appears as follows:

"(d) 'Representative of the client' means a person who has authority to obtain professional legal services and to act on advice rendered pursuant thereto, on behalf of the client."

To meet the definition, the person must both have authority to obtain the professional services and to act thereon. It is arguable that the letter grants to Bundy authority to obtain the services of a lawyer to defend this defendant with respect to the contemplated act of violence mentioned in the letter and that Bundy was authorized to act on behalf of the defendant on the advice of a lawyer who might be procured by Bundy for the defendant. We shall assume, *arguendo,* that Bundy was granted authority both to obtain professional legal services and to act on behalf of defendant on professional advice of the lawyer. The text of the rule would seem to be satisfied, but the history of the rule tends to support a holding that "the client" to which the definition applies must be a business entity.[2]

In 1974, pursuant to *former* ORS 173.340, the Law Improvement Committee, a legislative service agency, appointed the Advisory Committee on Evidence Law Revision. For five years, the Advisory Committee considered the law of evidence with a view to constructing a modern code of evidence. The minutes of the Advisory Committee for April 15, 1977, concern the lawyer-client privilege. Former Circuit Judge Robert E. Jones (now an associate justice of this court), a member of the committee, noted that Oregon case law had extended the privilege to corporations but that there was no determination in the case law as to which representatives of a corporation may enjoy privileged communications with the corporate lawyer. The minutes continue as follows:

> "Judge Jones indicated that the most restrictive position is the 'control group' test, which limits application of the privilege to persons with authority to seek and act upon legal advice for the client corporation."

Minutes, Advisory Committee on Evidence Law Revision, April 15, 1977, p 2. Other members of the committee then voiced views as to which corporate officers or employees of a corporate client the client's privilege should apply.

The May 6, 1977, minutes of a subcommittee disclose

---

[2] Where we use the term "business entity" in this opinion, we use it, for the purposes of this opinion, to refer only to a business organization that can act only through its officers, employees and agents.

a return to the subject. The respective remarks of the members all concerned the communications of a corporate officer or employee with the corporation's lawyer. The minutes then state:

> "Since the members were apparently agreed that the control group test was far too restrictive, i.e., the privilege attaches only if the employe is in a position to control or to take a substantial part in a decision about any action which the corporation may take on the advice of the attorney, Judge Unis suggested the privilege be extended to all communications between corporate employe and corporate attorney if:
>
> > "1) the employe has the power to render the corporation liable;
> >
> > "2) it is the duty or job of the employe to report to corporate counsel; and
> >
> > "3) the communication is about a matter of interest to the corporation.
>
> "The members agreed that this proposal should be recommended to the full committee at the next meeting as a definition of 'representative of the client' to be added to Federal Rule 503(a) as subsection (2).[3] The members also agreed that Uniform Rule 502(a)(2) defining 'representative of the client' embodies 'control group' concepts and is, therefore, too restrictive."

Minutes, Advisory Committee on Evidence Law Revision Subcommittee, May 6, 1977, pp 3-4.

Committee minutes for May 31, 1977, reflect that the committee, on the recommendation of the subcommittee, added to the list of definitions in Rule 503 the following:

> "(2) A 'representative of the client' is one who may be charged with liability for the alleged acts, omissions or transactions for which his employer may be charged and whose duty or job is to report to the client's lawyer concerning a matter of interest to the client."

Committee minutes for July 23, 1977, state that the definition was added "in response to possible problems concerning corporate clients."

---

[3] The committee was using the proposed Federal Rule as a point of departure for discussion and drafting.

The minutes for January 13, 1978, show that the committee turned again to this subject and discussed whether the definition was too broad. Several members participated in this discussion, and not one of them said anything that remotely suggested that the committee was concerned with anything but communications between employees of a corporation and corporate counsel.

Under date March 21, 1978, the Legislative Counsel Committee prepared a rough draft of a bill for an act in accordance with Advisory Committee action, and the definition was that already discussed above. Further rough drafts under date April 27, 1978, and October 26, 1978, were unchanged in this respect.

In 1979, the legislature repealed the statute under which the Advisory Committee existed. Legislative Counsel informed the Advisory Committee that its work would be carried forward by the 1979-81 Interim Joint Committee on the Judiciary. A draft of the new evidence code proposed by the Advisory Committee under date November 1979 was turned over to the Interim Committee with the definition unchanged.

A subcommittee of the Interim Committee considered the matter (with some members of the former Advisory Committee present) and was not convinced that the definition should be so broad. A comment was prepared by the subcommittee:

"In general, Rule 503 is consistent with current Oregon law although it extends to areas in which current law is either silent or unclear. The major discussion on Rule 503 concerned paragraph (4) of subsection (a), the definition of 'representative of a client.' The reason the definition is important is that the general rule of privilege extends the privilege to communications between a client's representative and the lawyer and to those between representatives of the client.

"The subcommittee rejected the Advisory Committee's definition as too broad and adopted instead a 'control group' test. Under this test, a representative of a client is anyone who has authority to obtain professional legal services and to act on advice rendered pursuant thereto on behalf of the client. Thus it is not any person who is in a master-servant relation to the client but is limited to 'top-echelon' persons. There is no precise delineation of who is in the control group. It would

depend on the corporate structure, if it's a corporation, or the actual relationship between the client and the other person involved and would have to be determined on a case by case basis.

"The Advisory Committee's proposal would probably have expanded attorney-client privilege further than the courts have yet done. It is not so clear that the subcommittee proposal will do that. In any case, Oregon courts have not adopted any definition of 'representative of a client' so a statutory definition changes the law at least to that extent.

"To the extent that the subcommittee failed to adopt the Advisory Committee's recommendation, the subcommittee's definition could be considered controversial. However, the members of the Advisory Committee present at the work session did not object and indeed, suggested the control group test."

After the matter had been considered by the full Interim Committee, an amendment to the definition was adopted that states the definition as it now exists in OEC 503(1)(d). The Interim Committee prepared a commentary as follows:

"The Judiciary Committee rejected the Advisory Committee's definition of 'representative of the client' in favor of the more restrictive 'control group test.' The Committee adopts the following commentary from the comment to Rule 503(a)(2), *Alaska Rules of Evidence,* Alaska Bar Association, 115 (May 1979).

" 'The Proposed Federal Rules of Evidence as submitted to Congress by the United States Supreme Court did not contain a definition of 'representative of the client.' Because of uncertainty about the extent of the privilege to be granted to corporate clients, the Advisory Committee came out in favor of a case-by-case analysis. This approach is rejected here. 'An ad hoc approach to privilege pursuant to a vague standard achieves the worst of possible worlds: harm in the particular case because information may be concealed; and a lack of compensating long-range benefit because persisting uncertainty about the availability of the privilege will discourage some communications.' Note, *Attorney-Client Privilege for Corporate Clients: The Control Group Test,* 84 Harv. L. Rev. 424, 426 (1970). No definition of 'representative of the client' will be perfect, but the best approach to corporate privilege developed to date is the 'control group' test as adopted in

Alaska Rule 503(a)(2). *See City of Philadelphia v. Westinghouse Electric Corp.,* 210 F. Supp 483, 485 (E.D. Pa. 1962). The 'control group' test is admittedly restrictive and has been criticized by some courts. *See, e.g., Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487, 491-492 (7th Cir. 1970), *aff'd by an equally divided court per curiam,* 400 U.S. 348, [91 S Ct 479,] 27 L. Ed. 2d 433 (1971). However, the restrictive view brings the corporate privilege more in line with the privilege available to unincorporated business concerns. Business organizations should not receive different treatment on evidence questions in courts of law merely because of differences in financial structure.

" 'If, for example, A runs a taxi service as a sole proprietorship with several employees, and one employee driver is involved in an accident for which A is sued, the employee's statements to A's attorney are not within the attorney-client privilege, even though A may order his employee to talk with the lawyer. If A incorporates, the ruling should not change. It should be sufficient that A and other corporate officers having the capacity to seek legal advice and to act on it can claim the benefits of the privilege for private communications with counsel. A more permissive privilege would result in suppression of information conveyed to attorneys by employees who are more like witnesses than clients and who have no personal desire for confidentiality.' "

Eventually, the work product of the Interim Committee was reflected in House Bill 2030 introduced in the 1981 session of the legislature. The definition was the same as now found in the rule. Our review of the minutes of the legislative committees to which HB 2030 was referred has found no discussion of Rule 503 that offers any support for belief that the definition was meant to include representatives of an individual client as distinguished from a business entity. No one apparently realized that the text of the proposed definition was not limited to a business entity.

When the Oregon Evidence Code was adopted by the 1981 legislature, legal counsel for the House Committee on the Judiciary and for the Senate Justice Committee prepared a commentary that, although not adopted by the assembly, was denominated by the chairpersons of the respective committees as the "official commentary" as filed with the Secretary of

State. With respect to paragraph (d), this essentially repeated the commentary of the Interim Committee and expanded thereon. Again, there is nothing in this commentary to suggest that the legislature had any client in mind other than a business entity.

Professor Laird C. Kirkpatrick, who followed closely the work of the Advisory Committee and the 1979-81 Interim Joint Committee on the Judiciary of the Oregon Legislature in connection with the proposed code, has written a treatise on the code. With respect to paragraph (d), he writes:

> "The definition of *representative of the client* contained in Rule 503(1)(d) determines the scope of the attorney-client privilege for corporations, unincorporated associations, and other organizations or entities that can communicate only through a representative." (Emphasis in original.)

Kirkpatrick, Oregon Evidence 149 (1982).

The foregoing lengthy discussion of the history of the definition of "Representative of the client" demonstrates that the definition was intended to apply to the situation where a corporation, or at least some business entity akin to a corporation, was involved. The problem is that the legislature did not express that limitation in the words it chose to use to enact a law. The problem is all too familiar.[4] The resolution is all too difficult.

Suppose that a motor vehicle strikes and severely injures a pedestrian, and the driver flees the scene without leaving name and address. The driver, rather than going home, goes to an inn and calls a friend. The driver tells the friend what has happened and asks the friend to employ a lawyer for the driver, to obtain the advice of the lawyer as to the driver's next course of conduct and to take any action on behalf of the driver that the lawyer might recommend, such as whether to reveal to the police the driver's whereabouts, the driver's identity, the driver's usual place of abode or any number of things that might be important to investigation of the crime. Surely, this hypothetical friend is "a person who has authority to obtain professional legal services and to act on advice rendered pursuant thereto," on behalf of the driver,

---

[4] *See* Frohnmayer, *Of Legislative Intent, the Perils of Legislative Abdication, and the Growth of Administrative and Judicial Power,* 22 Will L Rev 219 (1986).

and if the lawyer accepts the employment and renders advice, the driver is a client of that lawyer.

In the case at bar, defendant's letter to Bundy could be construed to grant authority to Bundy to obtain professional legal services, and we have assumed, *arguendo,* that the letter authorized Bundy to act on the advice of the lawyer. That Bundy neither obtained professional legal services for defendant nor acted thereon has nothing to do with whether the privilege is applicable. If the authority to obtain and to act existed, the privilege exists under the *text* of the rule.

■     If we conclude, however, that the "legislative" history requires an interpretation that the definition applies only to representatives of a business entity client, this defendant loses his argument based on the rule. The history of the definition makes it clear that the definition would not even have been included in Oregon's version of Rule 503 except for concern over communications between a business entity's lawyer and employees or officers of the business entity.

■     Defendant has not argued that he would win this point under the common law. Were it not for the inclusion in the rule of the definition of "[r]epresentative of the client," defendant would have no statutory basis for challenging admission of the letter. Because it is so clear that the legislature never intended to change the common law to provide a basis for this defendant's argument, we reject it.[5]

## II.  *OREGON CONSTITUTION, ARTICLE I, SECTION 12*

Article I, section 12, of the Oregon Constitution provides:

> "No person shall * * * be compelled in any criminal prosecution to testify against himself."

Although in the courts below defendant contended that his privilege against self-incrimination under section 12 would be violated by an order to produce the letter, his argument cited only decisions of the Supreme Court of the United States concerning the Fifth Amendment to the Constitution of the United States. He made no principled argument that either

---

[5] We do not do so without misgivings. This writer has expressed his opinion (in which Linde and Carson, JJ., joined) that the text of the Oregon Evidence Code in at least one other respect does not mean what a majority of this court thought the framers meant. *See State v. Ogle,* 297 Or 84, 99-112, 682 P2d 267 (1984) (Lent, J., dissenting).

the text of section 12 or any decision of an Oregon court required the result for which he contends. In this court defendant reargued the Fifth Amendment decisions and argued the state constitution only as follows:

> "The analysis under Article I, section 12 would be similar and would require at least as much protection as under the federal standard. It should go further. As noted in the above footnote, a defendant could not be compelled to produce an incriminating communication in the absence of a grant of transactional immunity. In addition, this court should consider whether to strenghten [sic] the protections accorded the contents of private papers under Article I, section 12."

The footnote was as follows:

> "In [*United States v.*] *Doe,* [465 US 605, 104 S Ct 1237, 79 L Ed 2d 552 (1984),] an express grant of use immunity was a necessary prerequisite to compulsory production. In Oregon, a grant of transactional immunity would be necessary. *See State v. Soriano,* 298 Or 392, 693 P2d 26 (1984)."

This is hardly a principled argument that the state constitutional privilege is broader than the federal counterpart.

We have firmly established that this court will not reach a Fourteenth Amendment Due Process issue unless we first determine that a defendant does not prevail under the state constitution. *State v. Kennedy, supra.* In order to do that, when a defendant relies on the state constitution but does not make a principled argument on the state constitution, we are forced into the uncomfortable position of inquiring whether there is any principled argument that has been made in some other case or can be made in this one, and then dealing with the argument, if any.[6]

---

[6] *See Ram Development Corp. v. Siuslaw Enterprises,* 283 Or 13, 18 n 2, 580 P2d 552 (1978), where we said:

> "This court is not comfortable in the role of devil's advocate. Our system of justice, based as it is on the adversary concept, is predicated upon each side of a controversy submitting his case, in its best light, to the arbiter of law and fact. When one side's presentation is poor, the arbiter's task becomes all the more difficult, and justice, as a result, suffers. When one side makes no presentation at all, the court is placed in the somewhat difficult position of first constructing, then critically evaluating and finally passing judgment on the arguments supporting that side of the controversy."

We recently noted:

> "[I]dentity of 'meaning' or even of text does not imply that the state's laws

■ ■    We should start by considering to whom the state constitutional provision is addressed. The text forbids compelling one to testify against himself. The text is in the passive voice. It does not tell us in so many words who is forbidden to compel one to testify against himself. It does not tell us what kind of compulsion is forbidden. It appears to us that the party forbidden to compel a person to testify against himself must be a governmental body.[7] A governmental body can act only through its officials, employees and agents. In other words, the text speaks to the representatives of government. It forbids these representatives to compel self-incriminating testimony. Force, threats of force or court process (such as subpoenas or orders of the court to testify) are forms of compulsion.

■    Of course, the word "testify" has a broader meaning than those words given from the witness stand in open court. The representatives of government cannot compel a communication from a person and then give evidence of that communication in a criminal prosecution against that person. It is the compelling of the communication by the representative that vitiates its use to convict the person making the communication.

■    In the case at bar, the communication, i.e., the testimony "against himself," that is sought to be used for conviction is the content of the letter by defendant to Bundy. There is not one bit of evidence that any representative of the state or any other governmental body in any way compelled

---

will not be tested against the state's own constitutional guarantees before reaching the federal constraints imposed by the Fourteenth Amendment, or that verbal formulas developed by the United States Supreme Court in applying the federal text also govern application of the state's comparable clauses."

*Cooper v. Eugene Sch. Dist. No. 4J,* 301 Or 358, 369, 723 P2d 298 (1986), *and see* the effect of failure to argue state claims, *id.* at n 12.

[7] In *State v. Barrett et al.,* 121 Or 57, 62, 254 P 188 (1927), we said:

"The constitutional provision referred to applies only against some governmental action of the state, or that of some agency of the state, and has no application to the action of private individuals who are not employed by or acting under the orders or directions of some officer or agent of the state."

This position is in contrast to the common-law rule against coerced confessions, which was codified among the earliest Oregon laws. That rule prohibits a confession induced by fear produced by threats "whether in the course of judicial proceedings, or to a private person * * *." General Laws of Oregon, § 169, p 362 (Deady & Lane 1843-1872). This statute currently appears, in substantially the same language, at ORS 136.425(1).

defendant to communicate to Bundy defendant's intent to commit an act of violence against his wife. When defendant communicated this intent to Bundy, he did so of his own volition. That he did so in an unprivileged communication robbed his formed intent of any privacy that he might have otherwise expected, such as confiding his thought to a diary.[8]

Here, the state does not seek to compel defendant to make any communication. The communication had already been made. Had he been subject to subpoena of the State of Oregon, Bundy could have been brought to the trial and questioned under oath as to the content of the letter. In other words, the state could have produced evidence of the content of the letter through the testimony of Bundy. That the letter itself was within the State of Oregon did not make it possible for the state to obtain the communication to Bundy; rather, it enabled the state to obtain evidence of the communication's content.

Defendant's privilege is one of not being compelled to make the communication. He has no privilege to protect from compulsion the production of this evidence, i.e., the letter, of his communication.

## III. *FEDERAL CONSTITUTION: DUE PROCESS*

Defendant asserts that production of the letter by his lawyer is protected by the Fifth Amendment as applicable to the states by the Due Process Clause of the Fourteenth Amendment.

In the trial court, defendant relied on *Boyd v. United States,* 116 US 616, 6 S Ct 524, 29 L Ed 746 (1886), and *Bellis v. United States,* 417 US 85, 94 S Ct 2179, 40 L Ed 2d 678 (1974). In this court he also contended that *Fisher v. United States,* 425 US 391, 96 S Ct 1569, 48 L Ed 2d 39 (1976), and *United States v. Doe,* 465 US 605, 104 S Ct 1237, 79 L Ed 2d 552 (1984), supported his claim of protection from an order for his lawyer to produce the letter.

---

[8] We do not decide, because this case does not require it, whether a defendant could be compelled to produce a diary or journal in which he recorded his thoughts or actions. We mention recording something in a diary only to draw the clear distinction between communicating one's state of mind to a document meant for no one else's eyes and the deliberate communication of that state of mind to another person.

It is arguable that *Boyd* could be so read, but the Court has made it quite clear in *Fisher* that in this respect *Boyd* has no continuing vitality. *Fisher v. United States, supra,* 425 US at 405-14.

*Bellis* is not in point, for it concerned only the question whether a former partner could successfully resist a subpoena for the production of records of the former partnership in his possession under the privilege against self-incrimination afforded by the Fifth Amendment. The Court held that he could not, although there is some dictum that would be of comfort to this defendant.

In *Fisher* the Internal Revenue Service issued a summons to the taxpayer's attorney for the production of work papers for tax returns that the taxpayer's independent accountant had prepared for the taxpayer. The taxpayer had retrieved the papers from the accountant and turned them over to the attorney for the purpose of having the attorney assist the taxpayer in resisting the claims of the Service. The decision is well summarized in 61 J. Tax'n 66 (1984):

> "The Court held that the attorney's production of the tax return materials did not violate his client's Fifth Amendment privilege because the latter was entitled to this protection only when 'compelled to make a *testimonial* communication that is incriminating.' (Emphasis in original.) The Court reasoned that since the Fifth Amendment protected an individual only against compelled testimonial communications, it was not violated by a demand that the individual produce papers already in existence which an independent accountant (not he) had prepared.

> "At the same time, however, the Court realized that the disclosure of the contents of the papers was not the only method of self-incrimination; a person may incriminate himself merely through the act of producing the documents. The Court, therefore, created a two-part test to determine whether compliance with a document demand, whether by summons or subpoena, would result in taxpayer's production of 'incriminating testimony': (1) if the existence and location of the requested papers are unknown to the Government, the taxpayer's compelled production of those documents 'tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer,' and (2) where the taxpayer's production of documents 'implicitly authenticates' the documents, the production provides a link in the chain of

incrimination. If the facts fulfill the requirements of these tests, (under the 'act of production' analysis), then the taxpayer could assert a valid Fifth Amendment claim to avoid compliance with the summons or subpoena.

"The Court found that the Fifth Amendment privilege was not implicated in *Fisher* for two reasons: the existence of the accountant's workpapers was a 'foregone conclusion' and the Government could not use the taxpayer to authenticate the documents. The Court, therefore, held that the summons served upon taxpayer's attorney was properly enforced." (Footnotes omitted.)

The Court itself expressed its holding as follows:

"Our above holding is that compelled production of documents from an attorney does not implicate whatever Fifth Amendment privilege the taxpayer might have enjoyed from being compelled to produce them himself."

425 US at 402. The Court then explored whether the production was protected by the attorney-client privilege, but that holding and that discussion is of no interest to us because that privilege is codified in this state, and we have already held in Part I of this opinion that it is not applicable to this case.

In *United States v. Doe, supra,* a grand jury sought business records prepared by the owner of the businesses. When he refused to produce them voluntarily, the grand jury issued subpoenas for production. The owner moved to quash the subpoenas, asserting the Fifth Amendment privilege. The District Court and Court of Appeals sided with the owner. On certiorari, the Supreme Court of the United States held that the contents of the documents were not privileged because the Fifth Amendment protects only against compelled self-incrimination, and the documents were not prepared under any compulsion; in fact, the preparation was concededly voluntary. The Court further held, however, that the act of producing the documents in response to the subpoena would be privileged because it would be testimonial in the sense that the District Court had found as fact that production would concede the existence of the documents and the owner's belief that the documents were those described in the subpoenas.

*Doe* might be of some support to defendant in the instant case if the letter had been in his possession. We believe, however, that the Supreme Court of the United States

would hold otherwise on the facts at hand, for the document was in the hands of his lawyer (as in *Fisher*), and the existence of the document and its general content were known to the police by reason of defendant's own communication to his sister and Thomas and by reason of Bundy's communication to the police. In those circumstances, compelled production of the document was not necessary to proof of its existence, nor was it any indication of defendant's belief that the letter was the document described in the state's motion and the court's order.

Because of our conclusion that neither the state nor the federal constitution affords defendant the protection he seeks, we need not address his argument that he had to be granted transactional immunity in return for the production of the letter.

The decision of the Court of Appeals and the judgment of the trial court are affirmed.