Argued and submitted June 13, affirmed October 19, American First Estate Services' petition for review and Little's petition for review denied December 20, 1994 (320 Or 492)

Cameron R. LITTLE,
*Appellant,*

*v.*

STATE OF OREGON,
by and through the
DEPARTMENT OF JUSTICE,
*Respondent,*

*and*

AMERICAN FIRST ESTATE
SERVICES, INC.,
an Oregon corporation,
*Appellant.*

(92-1131CV; CA A78617)

883 P2d 272

Donald G. Grant argued the cause and filed the briefs for appellant Cameron R. Little.

Christopher R. Hardman argued the cause for appellant American First Estate Services, Inc. With him on the brief was Holmes, Folawn & Rickles.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and Riggs and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Cameron R. Little and American First Estate Services, Inc. (AFES) appeal from a judgment modifying a civil investigative demand, ORS 646.618, which the Department of Justice served while investigating alleged violations of Oregon's Unfair Trade Practices Act. ORS 646.608 *et seq*. In particular, Little and AFES assert that the circuit court erred in requiring production of allegedly privileged documents relating to the sale and preparation of revocable living trusts and in failing to limit the scope of DOJ's investigation. We affirm.

AFES commonly uses the services of attorney Little in conjunction with its business of selling revocable living trusts[1] to senior citizens. AFES identifies and contacts prospective customers through the mail or over the phone. If a potential customer expresses interest in learning more about trusts or buying a trust, AFES sends one of its agents to the person's home. If, after speaking with the agent, a person decides to purchase a trust, he or she pays the agent a fee and then fills out an initial application supplying AFES with the person's name, address, and other "basic personal and financial data." The AFES agent then tells the customer that an attorney should prepare the trust documents, and that if the customer does not have an attorney, AFES can supply one from a referral list, including Little.[2]

After the initial sale, AFES remains active in the trust preparation.[3] First, AFES forwards the original[4] application to Little. Little then prepares drafts of the completed trust documents and sends those drafts either directly to the customer or to the AFES agent, who then delivers them to the

[1] The finished product provided by AFES is a three-ring binder containing the trust documents, pour-over wills, durable powers of attorney, and directives to physicians.

[2] If the customer chooses an attorney from AFES's referral list, the attorney is fully compensated for preparing the trust from the initial fee collected by the AFES agent.

[3] AFES customers sign a "Disclosure and Compliance" statement that provides, in part, "[I]t is my/our wish that the company, and its representatives, act as intermediaries in facilitating the establishment of the trust."

[4] AFES retains a copy of the application and uses it to perform a "liquid risk analysis," which determines if the customer might benefit from moving assets from "risky" investments to annuities sold by American First Financial Services.

customer. In either event, the AFES agent reviews the drafts with the customer to ensure that they express the customer's intent, helps the customer assemble and record, as needed, any documents such as deeds and memorandums of trust, and takes copies of those documents and corrected trust drafts to the AFES office. Those documents are then forwarded to Little, who completes the final trust documents. Finally, Little sends the final trust documents to the AFES agent, who assembles them in a binder and delivers them to the customer for execution.

In 1992, the Department of Justice began suspecting that AFES and Little, through their activities involving the sales of revocable living trusts, were violating the Unlawful Trade Practices Act. On November 20, 1992, DOJ served AFES and Little with notices of alleged unlawful trade practices. Shortly thereafter, DOJ served civil investigative demands (CIDs) on both AFES and Little. The CID for Little sought, in relevant part:

"Copies of the entire contents of all files in which you produced or assisted in the production of living trusts for Oregon consumers referred to you by Security Benefits, Inc.[,] American First Financial Services, Inc., and American First Estate Services, Inc."

The CID for AFES sought the contents of files pertaining to Oregon consumers who had purchased living trusts, as well as other business documents.

AFES and Little responded by filing petitions to set aside or modify the CIDs. Little argued that: (1) the attorney-client privilege protects from disclosure information in his client files; and (2) DOJ must show probable cause before obtaining the requested information. AFES echoed Little's arguments pertaining to the probable cause showing and further asked the court to issue a "protective order" limiting the scope and manner of DOJ's investigation because of alleged injury to AFES's business.

The trial court entered a judgment modifying the CID. That judgment provides, in part:

"2. Little shall produce for the STATE copies of all documents received by LITTLE from consumers through * * * AFES and AFFS or any of their agents or representatives,

prior to LITTLE sending a notice of representation letter to the consumers. These documents are from files in which LITTLE produced or assisted in the production of living trusts for Oregon consumers referred to him by * * * AFFS and AFES."

In issuing the judgment, the court declined to require DOJ to show probable cause before serving the CIDs and determined that it lacked the authority to impose a protective order limiting the scope of DOJ's investigation:

"My problem is very simple. I don't see where I get the authority to tell them what to do. I see where I have got some authority here where if they file a lawsuit, I can tell them, 'Show me the probable cause.' I see that. * * * [B]ut I don't see where I have got the authority to—before they file a lawsuit—to tell them to show me probable cause.

"* * * * *

"My authority is to modify or delete the particular demands that they have. That's the limit of my authority. * * * I get to cross out parts of their demand. I don't get to tell them what to do outside of that piece of paper."

■     Little first assigns error to the trial court's determination, embodied in paragraph 2 of the judgment, that Little must produce all "pre-retention" documents prepared by prospective trust purchasers and passed through to him by AFES and its agents. Little argues first that those documents are subject to the attorney-client privilege. We disagree.

OEC 503(2) describes the rule:

"A client has the privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"(a)   Between the client or the client's representative and the client's lawyer or a representative of the lawyer;

"(b)   Between the client's lawyer and the lawyer's representative;

"(c)   By the client or the client's lawyer to a lawyer representing another in a matter of common interest;

"(d)   Between representatives of the client or between the client and a representative of the client; or

"(e)   Between lawyers representing the client."

■    To successfully invoke the attorney-client privilege, the person seeking to exclude the evidence must show: (1) the communication is confidential within the meaning of OEC 503(1)(b); (2) the communication was made for the purpose of facilitating the rendition of professional legal services to the client; and (3) the communication was between persons described in OEC 503(2)(a) through (e). *State v. Jancsek*, 302 Or 270, 275, 730 P2d 14 (1986).

The attorney-client privilege does not protect communications from purchasers channeled through AFES because those communications do not satisfy the third *Jancsek* condition: They were not "between those persons described in one of the paragraphs, (a) through (e), of OEC 503(2)." *State v. Jancsek, supra*, 302 Or at 275. In this case, the only arguably applicable subsection is OEC 503(2)(a), *i.e.*, communications "between the client's representative and the client's lawyer or a representative of the lawyer." OEC 503(1)(d) defines "representative of the client":

" 'Representative of the client' means a principal, an employee, an officer or a director of the client:

"(A)   Who provides the client's lawyer with information that was acquired during the course of, or as a result of, such person's relationship with the client as principal, employee, officer or director, and is provided to the lawyer for the purpose of obtaining for the client the legal advice or other legal services of the lawyer; or

"(B)   Who, as part of such person's relationship with the client as principal, employee, officer or director, seeks, receives or applies legal advice from the client's lawyer."

In *State v. Jancsek, supra*, the court construed an earlier version of OEC 503(1)(d), which provided:

" 'Representative of the client' means a person who has authority to obtain professional legal services and to act on advice rendered pursuant thereto, on behalf of the client."

After an extensive analysis of the legislative history underlying that definition, the court concluded that "the definition applies only to representatives of a business entity client * * *." *State v. Jancsek, supra*, 302 Or at 282.

The present version of OEC 503(1)(d), enacted in *Jancsek's* wake in 1987,[5] makes explicit what was implicit in its antecedent: Only a person acting on behalf of a business entity client can be a "representative of the client." Because the clients here—the prospective purchasers—were individuals, and not impersonal entities, AFES and its agents could not be "representatives of the client." Accordingly, communications from prospective purchasers to AFES's agents, which the latter passed on to Little, were not communications within the meaning of OEC 503(1)(d) and, thus, were not privileged.[6]

■      Little next argues that, in any event, he should not be required to disclose the identities of his clients because the attorney-client privilege protects that information from disclosure. Again, we disagree.

Under the common law, absent peculiar circumstances, the attorney-client privilege did not shield the identities of clients. *See In re Illidge*, 162 Or 393, 405, 91 P2d 1100 (1939); *Cole v. Johnson*, 103 Or 319, 333-34, 205 P 282 (1922). In passing OEC 503, the legislature did not intend to alter that common law rule. *See* Legislative Commentary to OEC 503, reprinted in Kirkpatrick, *Oregon Evidence* 220 (2d ed 1989). Here, Little made no showing of "peculiar circumstances" sufficient to justify protection of the identities of trust purchasers. Although Little argues that the disclosure of client identities could irreparably damage *his* estate planning business, that concern, which is extraneous to any interest of his clients, is irrelevant to the scope of the attorney-client privilege.

---

[5] Or Laws 1987, ch 680, § 1.

[6] Little cites *Brink v. Multnomah County*, 224 Or 507, 356 P2d 536 (1960), for the proposition that "a communication '*by any form of agency* employed or set in motion by the client is within the privilege.'" 224 Or at 516-17. (Citation omitted; emphasis Little's.) However, no subsequent case cites *Brink* for that proposition. In fact, many cases understand *Brink* to stand for the proposition that the privilege protects communications between an *attorney's* agent and the attorney—a relationship that Little concedes does not exist between him and AFES. *See, e.g., State v. McGrew*, 46 Or App 123, 126 n 2, 610 P2d 1245, *rev den*, 289 Or 587 (1980); *State v. Moore*, 45 Or App 837, 841, 609 P2d 866 (1980); *Triplett v. Bd. of Social Protection*, 19 Or App 408, 413 n 4, 528 P2d 563 (1974). In any event, *Brink* was decided before the adoption of the Oregon Evidence Code, and to the extent that it is inconsistent with the result in *Jancsek*, its continued vitality is uncertain.

■     Both Little and AFES next assign error to the court's ruling that it lacked authority to require DOJ to make a showing of probable cause before issuing CIDs to Little and AFES.

ORS 646.618(1) authorizes DOJ to issue CIDs:

"When it appears to the prosecuting attorney that a person has engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by ORS 646.607 or 646.608, the prosecuting attorney may execute in writing and cause to be served an investigative demand upon any person who is believed to have information, documentary material or physical evidence relevant to the alleged or suspected violation."

Little and AFES argue that, because DOJ had already served them with notices of alleged unlawful trade practices, DOJ must make a probable cause showing before serving any subsequent CIDs. Little and AFES base their argument on two statutes. First, ORS 646.632(1)[7] requires a prosecuting attorney to have probable cause before bringing suit for alleged violations of the UTPA. Second, ORS 646.632(2)[8] generally requires DOJ to give defendants notice of alleged unlawful trade practices before bringing suit. From those two statutes, Little and AFES reason that, because DOJ served them with notices of alleged unlawful trade practices, DOJ must have already decided that it had probable cause to bring a suit against them. Consequently, they contend, DOJ should be required to make a probable cause showing before serving any subsequent CIDs.

We are not persuaded. Little's and AFES's argument contradicts the plain text of ORS 646.618(1), which provides that DOJ may issue a CID "if it appears to a prosecuting attorney that there has been, is, or is about to be, an 'alleged

---

[7] ORS 646.632(1) provides:

"A prosecuting attorney who has probable cause to believe that a person is engaging in, has engaged in, or is about to engage in an unlawful trade practice may bring suit in the name of the State of Oregon in the appropriate court to restrain such person from engaging in the alleged unlawful trade practice."

[8] ORS 646.632(2) provides:

"Except as provided in subsections (5) and (6) of this section, before filing a suit under subsection (1) of this section, the prosecuting attorney shall in writing notify the person charged of the alleged unlawful trade practice and the relief to be sought."

or suspected violation' of the Unlawful Trade Practices Act." *Vendell Marketing Corp. v. Dept. of Justice*, 318 Or 189, 194-95, 863 P2d 1263 (1993). That is a far cry from requiring a showing of probable cause to support a CID.

Nor do ORS 646.632(1) and (2) require probable cause for issuance of a CID. Although ORS 646.632(1) requires DOJ to have probable cause before *bringing suit* against a defendant for violating the UTPA, it does not require probable cause before giving notice of alleged unlawful trade practices. Indeed, an enforcement proceeding under ORS 646.632 is a separate and distinct proceeding from an investigative demand proceeding under ORS 646.618. *See Vendell Marketing Corp. v. Dept. of Justice, supra*, 318 Or at 195. Consequently, DOJ's service of a notice of alleged unlawful trade practices does not trigger an obligation to show probable cause before serving a CID.

■　Finally, AFES assigns as error the court's ruling that it lacked authority to enter a protective order limiting the scope or manner by which DOJ conducts its investigation. AFES argues that, under ORS 646.618(2), a court has power analogous to that authorized by ORCP 36C[9] to enter a protective order.

ORS 646.618(2) provides:

"At any time before the return date specified in an investigative demand, or within 20 days after the demand has been served, whichever period is shorter, a petition to extend the return date, or to modify or set aside the *demand*, stating good cause including privileged material, may be filed in the appropriate court." (Emphasis supplied.)

AFES's argument fails, because it contradicts the plain language of ORS 646.618(2). *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The statute's text authorizes a court to set aside or modify the

---

[9] ORCP 36C provides, in part:

"Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.] * * *

"If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery."

investigatory demand itself, not the general scope or manner of DOJ's investigation. Nothing in the statute's context supports a broader reading, empowering a court to limit the general scope and manner of an investigation in addition to modifying or setting aside a specific investigative demand.

Affirmed.