Argued and submitted July 24, vacated and remanded in part; otherwise affirmed
November 13, 2003

STATE OF OREGON,
*Respondent,*

*v.*

DANIEL L. JENKINS, JR.,
aka Daniel J. Jenkins,
aka Daniel Loren Jenkins, Jr.,
*Appellant.*

9901-30573, 9906-34654;
A112291 (Control), A112292
(Cases Consolidated)

79 P3d 347

Jesse Wm. Barton argued the cause and filed the brief for appellant.

Daniel J. Casey, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

Defendant appeals from a judgment of conviction for solicitation to commit aggravated murder.[1] ORS 161.435; ORS 163.095(1)(a). Defendant makes four assignments of error, three of which we reject without discussion. In the fourth, defendant argues that the trial court erred in denying his motion to quash a subpoena issued by the state to a psychologist retained by his trial attorney and, as a result, admitting into evidence at trial statements that he made to the psychologist. The state contends that the court correctly ruled that the statements fell within the future crimes exception to the attorney-client privilege and the child abuse exception to the psychotherapist-patient privilege. We review for errors of law. *Frease v. Glazer*, 330 Or 364, 369, 4 P3d 56 (2000); *State v. Langley*, 314 Or 247, 263, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993). We need not address the psychotherapist-patient privilege because we conclude that defendant's statements were protected by the attorney-client privilege and were not subject to the future crimes exception to that privilege. Accordingly, we reverse and remand for a new trial.

From 1996 to 1998, defendant had a trading account at Bidwell and Company (the company), a discount stock brokerage firm. During 1998, defendant's investments through the company lost nearly $300,000 in value. Upset about his losses, defendant complained to the company that it should have advised him against making certain investments. Company president H. Gerald Bidwell (Bidwell) wrote to defendant, explaining that he had reviewed the transactions and concluded that the company had acted appropriately. Defendant then began to focus his anger on Bidwell. On September 8, 1998, defendant called Warren, the ex-husband of Bidwell's current wife. He identified himself as "John" and asked Warren if he would be interested in participating in a scheme to "whack" Bidwell. Warren inferred that defendant was asking him to assist defendant in a murder-for-hire.

---

[1] In a separate judgment, defendant also was convicted of first-degree theft, first-degree forgery, and tampering with public records. Those convictions are not relevant to the issue that we address in this opinion.

Warren declined and later told Bidwell and the police about the call. An investigation ensued and, among other things, the police learned that defendant had made numerous prank calls to Bidwell's home, sent Bidwell three e-mails with ominous messages predicting Bidwell's death, and stolen court records pertaining to the dissolution of Bidwell's marriage to his former wife. Defendant was arrested on January 9, 1999, and charged with solicitation to commit murder, theft, forgery, tampering with public records, and menacing. The indictment identified Bidwell as the victim for the purpose of the solicitation and menacing charges.

The state produced evidence that, while in jail awaiting trial, defendant told at least two people that he planned to commit several murders in the future. First, in May 1999, he told another inmate, Rohrscheib, that he intended to kill Warren and his children after he was released from jail because Warren had gone to the police. Later, defendant told Rohrscheib that he no longer wanted to hurt Warren's children but that he still wanted to kill Warren; in that conversation, he also stated that he wanted to kill Bidwell. Thereafter, on June 8, 1999, a psychologist, Dr. Colby, interviewed defendant. Defendant's attorney had retained Colby to evaluate defendant for the purpose of exploring possible defenses. During the interview, defendant said that he wanted his statements to Colby to be privileged, and defendant told Colby not to make a written report of their conversation. Defendant then told Colby that he intended to kill Bidwell, his wife, and their children.

Colby told defendant's attorney about the threats. She, in turn, reported them to the trial court in the presence of the prosecutor. The state then dismissed the charge against defendant for solicitation to commit murder and, two days later, in a second indictment, charged him with solicitation to commit aggravated murder. The second indictment identified Bidwell as defendant's intended victim. The remaining charges in the first indictment were consolidated for trial with the solicitation to commit aggravated murder charge in the second indictment. The state subpoenaed Colby as a witness at trial. Defendant moved to quash the subpoena, arguing that Colby was his attorney's representative and that both OEC 503(2)(a), the attorney-client privilege

rule, and OEC 504, the psychotherapist-patient privilege rule, barred admission of defendant's statements to Colby.[2] The state responded that defendant's threats fell within OEC 503(4)(a), the future crimes exception to the attorney-client privilege, as well as ORS 419B.040, the child abuse exception to the psychotherapist-patient privilege. The court ruled that both exceptions applied and denied defendant's motion to quash.

At trial, the state called Rohrscheib and Colby as witnesses. As described above, Rohrschreib testified regarding defendant's statements about his intention to kill Warren, Warren's children, and Bidwell. Rohrscheib also testified that, in return for his cooperation, he had received a five-day reduction in the six-month sentence that he had been serving. Colby testified that, during his interview with defendant, defendant told him that he intended to kill Bidwell and his wife. According to Colby, defendant first stated that he was unsure about taking the lives of Bidwell's children but later stated, "Yes, I think I will kill the Bidwell children in a way that will make Mr. Bidwell suffer for what he has done." The state also adduced other evidence of defendant's preoccupation with Bidwell, including the prank calls, the e-mails, and the stolen court records. In his defense, defendant conceded that he intended to harass Bidwell, but he contended that he was never serious about killing him. The jury found defendant guilty of solicitation to commit aggravated murder.[3]

On appeal, the parties renew their arguments concerning the attorney-client and psychotherapist-patient privileges. The state further argues that, if the trial court erred in admitting Colby's testimony, the error was harmless. The state also asserts that, even if the admission of Colby's testimony was not harmless, that testimony would be admissible in a new trial under OEC 504-5, which creates a new limitation on evidentiary privileges. *See* Or Laws 2001, ch 640, § 3.

---

[2] The text of the pertinent rules and exceptions is set out below.

[3] As noted, defendant also was convicted of first-degree theft, first-degree forgery, and tampering with public records for having stolen Bidwell's divorce records. However, at the close of the state's case-in-chief, the court granted defendant's motion for judgment of acquittal on the menacing charge.

Therefore, the state argues, a remand would serve no useful purpose.

We begin with defendant's argument that his statements to Colby were protected by the attorney-client privilege. OEC 503 provides, in part:

"(2)   A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"(a)   Between the client or the client's representative and the client's lawyer or a representative of the lawyer[.]"

The state implicitly concedes that, by its terms, OEC 503(2)(a) applies to the statements that defendant made to Colby. The record supports that concession. The communication was (1) made confidentially (2) for the purpose of facilitating the rendition of legal services to defendant and (3) between defendant and a representative of defendant's lawyer. *See State v. Jancsek*, 302 Or 270, 275, 730 P2d 14 (1986) (stating that, to successfully invoke the attorney-client privilege, the person seeking to exclude the evidence must show that (1) the communication is confidential within the meaning of OEC 503(1)(b), (2) the communication was made for the purpose of facilitating the rendition of professional legal services to the client, and (3) the communication was between persons described in OEC 503(2)(a) through (e)).

The state nonetheless urges that defendant's statements to Colby do not fall within the scope of the attorney-client privilege because, even if they satisfy the plain language of OEC 503(2)(a), threats of violence were not protected communications at common law. That argument is unpersuasive. In *State ex rel N. Pacific Lbr. v. Unis*, 282 Or 457, 579 P2d 1291 (1978), the Supreme Court construed the predecessor to OEC 503, ORS 44.040(1)(b) (1975), *repealed by* Or Laws 1981, ch 892, § 98. That statute did not explicitly provide for any exceptions to the attorney-client privilege. The court acknowledged that, "when the Oregon privilege statute was enacted [in 1862,] there was a recognized exception to the common-law privilege covering attorney-client

communications when the communication was made *in furtherance of* an intended crime." *Unis*, 282 Or at 462 (emphasis added). The court then stated:

> "Consistent with the recognition * * * that [ORS 44.040(1)(b)] is merely declaratory of the common law attorney-client privilege, and with our practice of construing the statute in light of the underlying policies which it is intended to serve, we hold, as an exception to the attorney-client privilege, that an attorney may, *under appropriate circumstances,* be required to testify about a client's communications which relate to future wrongdoing."

*Unis,* 282 Or at 462-63 (emphasis added). In construing the scope of the common-law exception, the court also stated that Uniform Rules of Evidence Rule 502(d) (1974) reflected the common-law rule. Rule 502(d) (1974) is identical to OEC 503(4)(a). Because, as pertinent here, the common-law exception is of a piece with the statutory exception, our disposition of the state's argument concerning OEC 503(4)(a) obviates the need to consider the common-law exception separately. Accordingly, we now turn to the statutory exception.

■       OEC 503 provides, in part:

> "(4)   There is no privilege under this section:
>
> "(a)   If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud[.]"

The state, as the proponent of the exception, had the burden of showing that it is applicable. *See Kahn v. Pony Express Courier Corp.*, 173 Or App 127, 134, 20 P3d 837, *rev den*, 332 Or 518 (2001) (holding that it is incumbent on party seeking disclosure of privileged material to show that material is subject to exception to privilege); *see also State v. Hansen*, 82 Or App 178, 186, 728 P2d 542 (1986), *rev'd in part on other grounds*, 304 Or 169, 743 P2d 157 (1987) (holding that the defendant, as proponent, "had the burden of showing that [an] exception to the patient-psychotherapist privilege is applicable"). The state contends that, in two distinct respects, defendant sought Colby's assistance in his plan to murder the Bidwell family. First, the state asserts that "defendant's request for Dr. Colby's silence about his plan to commit mass

murder upon his release from jail constitutes seeking a 'service' from 'a representative of the lawyer' 'to enable or aid' in the commission of multiple future crimes." In the state's view, "at least one of defendant's purposes [in requesting confidentiality] was to prevent interference with his plan * * *." Second, the state contends that defendant revealed his plan to Colby in order to buttress his courage to follow through with it.

■ We conclude that the future crimes exception is inapplicable here. There is no basis in the record to infer that defendant's request for confidentiality constituted a request for services to aid or enable defendant to commit crimes. To the contrary, the only reasonable inference is that defendant requested Colby's silence as a condition of *disclosing* his plan. Furthermore, there is no basis to infer that defendant sought to buttress his courage by talking with Colby; thus, the state's assertion to that effect is speculative. Because the state has not shown that the exception applies, we conclude that defendant's statements to Colby were protected by the attorney-client privilege.[4]

■ We turn to the state's argument that the admission of Colby's testimony was harmless evidentiary error. The Supreme Court recently has explained the focus of that inquiry. In *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003), the court stated:

> "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a fact-finder, would regard the evidence of guilt as substantial and compelling.
>
> "In determining whether the error affected the verdict, it is necessary that we review the record. However, in so doing, we do not determine, as a fact-finder, whether the defendant is guilty. That inquiry would invite this court to

---

[4] That conclusion makes it unnecessary to consider the parties' arguments concerning the psychotherapist-patient privilege.

engage improperly in weighing the evidence and, essentially, retrying the case, while disregarding the error committed at trial, to determine whether the defendant is guilty. Rather, when we review the record, we do so in light of the error at issue. We ask whether there was little likelihood that the error affected the jury's verdict. We recognize that, if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict, then there is little likelihood that the error affected the verdict. However, that is not a finding about how the court views the weight of the evidence of the defendant's guilt. It is a legal conclusion about the likely effect of the error on the verdict."

The state asserts that other evidence adduced by the prosecution to show that defendant intended to kill Bidwell was sufficiently strong that the jury would have found defendant guilty beyond a reasonable doubt even without Colby's testimony. We disagree with that assessment of the evidence. Contrary to the state's assertion, Rohrscheib's testimony regarding defendant's intentions did not render Colby's related testimony redundant. A jury would be more likely to find persuasive the word of a licensed psychologist than that of a convicted offender who has conceded that he received a shortened sentence in exchange for his testimony. *Cf. State v. Keller*, 315 Or 273, 286, 844 P2d 195 (1993) (testimony of medical professional presumably was persuasive to jury). Moreover, Rohrscheib's and Colby's testimony was not precisely the same. According to Rohrscheib, defendant stated that he wanted to kill Warren and Bidwell and, at first, *Warren's* children. Only Colby testified that defendant threatened to kill Bidwell's children. The jury may particularly have been influenced by Colby's testimony that defendant told him that "I think I will kill the Bidwell children in a way that will make Mr. Bidwell suffer for what he has done." Because we cannot say that there is little likelihood that Colby's testimony affected the jury's verdict, the error in admitting it was not harmless.

We turn to the state's argument that remand would be purposeless because, on remand, Colby's testimony will be admissible under OEC 504-5. That rule provides, in part:

"(1) In addition to any other limitations on privilege that may be imposed by law, there is no privilege under

ORS 40.225 [attorney-client], 40.230 [psychotherapist-patient] or 40.250 [physician-patient] for communications if:

"(a)   In the professional judgment of the person receiving the communications, the communications reveal that the declarant has a clear and serious intent at the time the communications are made to subsequently commit a crime involving physical injury, a threat to the physical safety of any person, sexual abuse or death;

"(b)   In the professional judgment of the person receiving the communications, the declarant poses a danger of committing the crime; and

"(c)   The person receiving the communications makes a report to another person based on the communications."

The legislature enacted OEC 504-5(1) after defendant's trial had ended, but it "applies to all communications, whether made before, on or after" its effective date, January 1, 2002, and "to trials or proceedings commenced on or after the effective date * * *." Or Laws 2001, ch 640, § 3. The state contends that a new trial in this case would be a "trial commenced after" that date and that, as such, the rule necessarily would apply to it. Relying on *State v. Meyers*, 153 Or App 551, 958 P2d 187 (1998), defendant counters that OEC 504-5 would not apply to a new trial.

We agree that, by its terms, OEC 504-5 will apply to a new trial after remand. The question remains whether remand therefore is unnecessary. In *Meyers*, the trial court had convicted the defendant based on evidence that we concluded was erroneously admitted. 153 Or App at 555-56. The state nevertheless urged us to affirm the conviction based on ORS 136.432, which took effect while the defendant's appeal was pending. *Meyers*, 153 Or App at 556. We considered the legislature's directive that ORS 136.432 "appl[ies] to all criminal actions pending or commenced on or after December 5, 1996." We concluded that the term "criminal actions" referred only to criminal trials, not appeals, and thus did not apply because the defendant's trial was no longer pending. We said:

"To read [the statute's effective date provision] as the state suggests would mean that the legislature intended to

change the rules of evidence retroactively, that is, after the trial courts already have ruled on evidentiary issues under the earlier law. Thus, rulings of the trial courts that were entirely correct at the time could be 'transformed' into errors after the fact, and defendants would have no opportunity to respond. Such a moving of the proverbial goal posts after the contest is over raises serious questions of due process. *See Jones v. General Motors Corp.*, 139 Or App 244, 264, 911 P2d 1243 (1996), *aff'd on other grounds* 325 Or 404, 939 P2d 608 (1997) (applying revised summary judgment standard retroactively on appeal would violate due process). When faced with competing constructions of a statute, we generally are required to 'choose the interpretation which will avoid any serious constitutional difficulty.' *State v. Duggan*, 290 Or 369, 373, 622 P2d 316 (1981)."

*Meyers*, 153 Or App at 559-60.

Here, the state does not contend that OEC 504-5 applies to this appeal. The quoted principle nevertheless informs our decision whether to remand this case for a new trial. Again, by its terms, OEC 504-5 applies only if, "[i]n the professional judgment of the person receiving the communications," the declarant has a clear and serious intent to commit a violent crime and poses a danger of committing the crime. To decline to remand this case would have the effect of assuming what Colby would have testified regarding those issues, that defendant would have been unable to rebut that testimony, and that the trial court, in the exercise of its function under OEC 104, would have found that Colby's testimony met the required standard. On this record, as a matter of fundamental fairness, we cannot properly assume the occurrence of those events.

Finally, the state argues that, if we remand this case, we should do so with instructions that, if the trial court determines that Colby's testimony pursuant to OEC 504-5 is admissible, it simply reenter the judgment convicting defendant of solicitation to commit aggravated murder. The state bases its argument, in part, on *State v. Cole*, 323 Or 30, 37, 912 P2d 907 (1996), where the court remanded a case for a new hearing on a motion to suppress and instructed the trial

court to reenter a judgment of conviction if the motion to suppress was denied. However, *Cole* is distinguishable from the circumstances here. In *Cole*, the issue was whether the trial court had erred in failing to suppress certain evidence. On remand, the trial court was not required to apply a new legal standard to the suppression decision; rather, the court was instructed to apply correctly the legal standard that existed at the time of the original trial. *Id.* at 37. Thus, *Cole* did not involve the possible retroactive application of a new legal rule to a retrial.

The state also argues that this court held in *State v. Fuller*, 56 Or App 719, 643 P2d 382, *rev den*, 293 Or 340 (1982), under circumstances similar to those here, that the applicability of a new evidentiary rule made remand for a new trial unnecessary. In *Fuller*, the trial court improperly permitted the state to impeach its own witness.[5] *Id.* at 722. While the case was pending on appeal, the 1981 Evidence Code took effect; under newly enacted OEC 607, a party could impeach its own witness. As here, the new rule applied to proceedings commenced after their effective date but not retroactively to earlier proceedings. Or Laws 1981, ch 892, § 101. We concluded that "[t]he only evidence improperly received in the first trial would be properly received in the second, and no purpose would be served in ordering a new trial." *Fuller*, 56 Or App at 723.

However, *Fuller* also is distinguishable from the circumstances here. In *Fuller*, this court was able to determine on the existing record that the erroneously admitted evidence would be admissible in a new trial. Here, on the other hand, the trial court must determine on remand whether defendant's statements to Colby are admissible based on an evidentiary record that is tailored to the requirements of OEC 504-5. The state cites no authority, and we are aware of none, for the proposition that a new trial would be unnecessary if the trial court were to determine, based on a *new* evidentiary record, that the challenged evidence is admissible.

---

[5] Under *former* ORS 45.590, *repealed by* Or Laws 1981, ch 892, § 98, a party could not impeach its own witness unless the witness's testimony was affirmatively damaging to that party's case.

Judgment of conviction for solicitation to commit aggravated murder vacated and remanded for new trial; otherwise affirmed.